552 So.2d 1259 (1989)
Patrick MORESI, et al., Plaintiffs-Appellees,
v.
STATE of Louisiana, DEPARTMENT OF WILDLIFE AND FISHERIES, Defendant-Appellant.
No. 88-753.
Court of Appeal of Louisiana, Third Circuit.
November 15, 1989.
Rehearing Denied December 21, 1989.
*1260 Moresi & Moresi, Paul G. Moresi, Jr., Abbeville, & Domengeaux & Wright, Richard C. Broussard, Lafayette, plaintiffs-appellees.
Allen, Gooch, Arthur I. Robison, Lafayette, for State.
Lawrence W. Moon, Lafayette, for defendant-appellee.
Before STOKER, DOUCET and LABORDE, JJ.
DOUCET, Judge.
This action arises primarily out of certain events which occurred on January 11, 1985 at Stelly's Landing in Vermilion Parish, Louisiana.
On that day, Wildlife and Fisheries Agents Larry Breaux and Ivan Vaughn, Jr. were at Stelly's Landing for the purpose of investigating complaints that Byron Begnaud had taken over the limit of ducks. None of the agents knew Byron Begnaud by sight. In connection with this investigation, the agents stopped all the boats which came into the landing. The third boat to come in and be stopped at the landing that morning was occupied by Patrick Damas Moresi, who was 18 years old at the time, and by Kern Alleman, who was 21. Kern Alleman died in February 1987, before the trial of this matter in April 1988.
The young men were returning from the Moresi and Alleman Camp driving a mudboat belonging to Dr. Howard Alleman, the father of Kern Alleman, and towing a flatboat containing equipment and supplies. Visible in the boat were five limits of ducks and an ice chest. Three of the limits were tagged as belonging to Paul Moresi, Jr., the father of Patrick Damas Moresi, Dr. Howard Alleman, and John Willis Darby. The other two untagged limits had been shot that day by Kern Alleman and Patrick Damas Moresi. The agents approached and boarded the boat. They did not ask permission to board. They examined the five limits of ducks. The agents inquired as to the ownership of the ducks and were informed that they belonged to the young men and to people remaining at the camp. The agents asked why no hunting license numbers appeared on the tags. Moresi replied that this was not required by law. Upon checking a pamphlet of hunting regulations, the agents discovered that Moresi was, in fact, correct.
The agents next inquired as to the contents of the ice chest. They were told that it contained the ducks from the previous day's hunt. Agent Breaux then opened the ice chest. According to the trial testimony of Patrick Damas Moresi, this was done without permission. Inside the chest were three more limits of ducks, one of which was tagged. The agents then asked why two limits were untagged. Moresi replied *1261 that the ducks were part of their possession limit and did not require tagging. Agent Breaux then went to his truck and called Agents Jukes and Schriefer, who were at the Little Prairie Landing, to determine whether possession of the untagged ducks from the previous day's hunt constituted a violation and to notify them to come to Stelly's landing. The agent then returned to the landing and read Moresi and Alleman the Miranda warning. Agent Breaux testified that the young men were under detention from that point.
When Agents Jukes and Schriefer arrived at Stelly's landing, Agent Jukes boarded the boat. He stated in his trial testimony that this was to inspect the boat for safety. He admits that he did not ask permission to board and did not have a warrant. Agent Jukes indicated in his testimony that he asked where the life jackets were and upon being told that they were in a locked compartment on the bow, he asked where the key was, took the key from the boat's ignition, and unlocked and inspected the locked compartment. Patrick Damas Moresi's testimony indicates that there was no discussion as to life jackets or their whereabouts. According to his testimony, an agent simply boarded the boat, and told Kern Alleman to give him the keys. Alleman did so and the agent unlocked the forward compartment and inspected it thoroughly. There is no testimony to indicate that a citation for a safety violation was ever discussed. No citation for any safety violation was given.
Agents Schriefer and Jukes then went with Moresi and Alleman to their fathers' camp. The testimony of Patrick Damas Moresi conflicts with that of the agents as to whether the agents asked Moresi and Alleman to take them to the camp. Agent Breaux testified that Moresi and Alleman told him they wanted to go back to the camp to speak to their fathers, one of whom was a lawyer. He states that he relayed this to Schriefer when he radioed him. Breaux further testified that he told Moresi and Alleman someone would have to go back with them since the investigation was unfinished. Schriefer stated in his testimony he told Moresi and Alleman that he would like to ride back with them and that they assented. Patrick Damas Moresi testified that neither he nor Kern Alleman expressed a desire to return to the camp. In support of this he testified that if he wanted to speak to his father, he had a CB radio available with which to do so. Additionally, he testified that the agents did not ask either him or Alleman to take them. According to Moresi's testimony, they were simply required to take the agents back to the camp. He did not believe they had any choice but to take the agents back to the camp.
After arriving at the Moresi-Alleman Camp, Shriefer identified himself to Paul Moresi, Jr. and Dr. Howard Alleman as a State game warden and asked the persons present at the camp to identify the tagged limits of birds found in the boat. The birds were identified. Agent Jukes opened and searched several ice chests found in the camp. Agent Jukes admitted at trial that this was done without permission and without a search warrant. Agent Schriefer then informed the Moresis and Allemans that he intended to issue citations for game violations to Patrick Damas Moresi and Kern Alleman. Agent Schriefer told Paul Moresi, Jr. that the young men would be taken back to the landing and cited. Paul Moresi, Jr. and Dr. Alleman accompanied them.
Once back at Stelly's landing, Agent Schriefer informed them that Patrick Damas Moresi and Kern Alleman would be issued citations for either taking over the limit of migratory game birds or possession of untagged game birds or both. Paul Moresi then asked Agent James Nunez, who had arrived during their absence from the landing, to examine the ducks to determine that two of the limits claimed by the young men had been shot the day before. Dr. Alleman told Agent Schriefer that it could be seen that the birds had been shot the day before because their eyes had opacified. Agent Schriefer ignored their remarks. Paul Moresi, Jr. told Agent Schriefer that it is not an offense to possess one's own limit of birds untagged. Agent Nunez testified that he, too, informed *1262 the other agents that this was not a violation. Paul Moresi, Jr. then asked Agent Schriefer to check the law regulating migratory game birds. Upon checking, Agent Schriefer could find no such violation. In spite of this, citations were issued to Patrick Damas Moresi and Kern Alleman for possession of untagged migratory game birds. Two untagged limits belonging to the young men were confiscated. Testimony indicates that they were later donated to the Catholic Church in Creole, Louisiana. The hunters then went on their way. At least three other hunters were cited for the same reason that day. None of the charges were ever prosecuted.
On January 15, 1986, Paul Moresi, Jr. and Dr. Alleman sent a letter to the Louisiana Department of Wildlife and Fisheries notifying it of the actions of its agents on January 11, 1986. Paul Moresi, Jr. further appeared before a meeting of the Louisiana Wildlife and Fisheries Commission on March 5, 1986 in order to protest the events of January 11, 1986. He notified the Commission that further harrassment of his family would result in legal action. A few days later, Patrick Damas Moresi received a letter from J. Burton Angelle, Secretary of the Department of Wildlife and Fisheries. That letter indicated that all charges against him had been withdrawn. The letter further stated that: "Although the charges were filed in good faith the Agents involved later ascertained that no violation occurred."
On March 25, 1986, Patrick Damas Moresi and Kern Alleman returned to the camp. Lodged in the front door they found a business card of Louisiana Wildlife Enforcement Agent Scott Guillory. Handwritten on the back of the card was the message: "We missed you this time but look out next time!!" The card was signed "Jimmie and Scott". Patrick Damas Moresi testified that when the card was found a portion of it preceding the exclamation points was torn out. Agents Scott Guillory and Jimmie Meaux later testified that the missing portion had held the name Clyde. They explained that they were looking for the camp belonging to Clyde Prejean which is located on the same canal as the Moresi-Alleman Camp. They had never been to either camp. They testified that they did not see the Prejean camp on the way down and seeing the Moresi-Alleman Camp, left the card, believing it to be the Prejean camp.
At trial, plaintiffs introduced a video tape taken March 1987, showing the Prejean camp to be clearly visible from the canal. Testimony indicated that the camp had not been moved between March 1986 and March 1987 and that no changes had occurred to impair the visibility of the camp.
Upon the card being given to him by his son, Paul Moresi, Jr. called Wildlife Commission member Jack Cappel and sent him a copy of the note. On May 7, 1986, he sent a letter by certified mail, return receipt requested, to J. Burton Angelle, requesting injunctive relief from harrassment by Wildlife Agents pursuant to La. R.S. 56:648.1 and 56:648.2. On April 16, 1986, Mr. Angelle responded to the March letter to Commission member Cappel enclosing a copy of a written statement by Agents Guillory and Meaux explaining the card. Dr. Clyde Prejean also called Paul Moresi, Jr. to corroborate their story by saying that he knew one of the agents and had invited him to his camp. No answer to the May 7, 1986 letter was received until December 1987, in which the Department declined to take action.
On May 8, 1986, suit was filed on behalf of Patrick Damas Moresi, Kern Alleman, Paul Moresi, Jr., and Howard Alleman pursuant to 42 U.S.C. § 1983 and La.C.C. art. 2315 for damages arising out of the incidents of January 11 and March 25, 1986. A trial on the merits was held on April 19, 1988. After hearing all the evidence the trial judge assigned oral reasons for judgment. On May 9, 1988, judgment was rendered dismissing plaintiffs' suit against Agent Nunez. He further rendered judgment in favor of the plaintiffs and against Agents Meaux and Guillory and the State of Louisiana in the amount of $1,000 to each plaintiff. Additionally, judgment was rendered in favor of plaintiffs and against Agents Schriefer, Vaughn, Breaux, and Jukes as follows:

*1263
 I. ACTUAL DAMAGES
 a) PAUL G. MORESI, JR. $10,000.00
 b) PATRICK DAMAS MORESI $10,000.00
 c) HOWARD ALLEMAN $13,000.00
 d) HOWARD ALLEMAN and BILLIE JOYCE FREDERICK $10,000.00
 ALLEMAN
 II. PUNITIVE DAMAGES
 a) PAUL G. MORESI, JR. $ 1,000.00
 b) PATRICK DAMAS MORESI $ 1,000.00
 c) HOWARD ALLEMAN $ 1,000.00
 d) HOWARD ALLEMAN and BILLIE JOYCE FREDERICK $ 1,000.00
 ALLEMAN
III. ATTORNEYS' FEES $32,939.10

Costs were assessed against the defendants. Defendants filed this appeal and have assigned error as follows:
I. Did the trial court err in concluding that an unlawful detainment, arrest, search and seizure occurred?
II. Did the trial court err in requiring defendants' counsel to mirandize plaintiff Patrick Moresi before questioning him about facts leading up to the incident which is the subject of the lawsuit?
III. Did the trial court err in concluding that Agents Meaux and Guillory were negligent in their actions in leaving a "card" at the Moresi-Alleman camp by mistake and that damages were due as a result thereof?
IV. Was the award of $32,939.10 in attorney fees by the trial court excessive?
V. Did the trial court err in awarding punitive damages to plaintiffs?
ASSIGNMENTS OF ERROR NUMBERS 1, 2, and 3:
La.R.S. 56:54 gives Wildlife Agents authority to arrest without a warrant "... any person violating any of the laws or regulations under the jurisdiction of the department," under the same circumstances required for a warrantless arrest under La.C.Cr.P. art. 213. La.C.Cr.P. art. 213 provides, in pertinent part, that a peace officer may make an arrest where he has "... reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer...." The reasonable cause required by La.C.Cr.P. art. 213 has been defined ad equivalent to probable cause. State v. Arceneaux, 425 So.2d 740 (La. 1983).
La.R.S. 56:55(A) provides that:
§ 55. Search with or without warrant
"The secretary or any commissioned wildlife agent may visit, inspect and examine, with or without search warrant, records, any cold storage plant, warehouse, boat, store, car, conveyance, automobile or other vehicle, airplane or other aircraft, basket or other receptacle, or any place of deposit for wild birds, wild quadrupeds, fish or other aquatic life or any parts thereof whenever there is probable cause to believe that a violation has occurred."
The first issue before the court is not whether any offense was committed. It is conceded that none was. Nor does appellant argue with the finding that an arrest, search and seizure occurred. The first issue before the court is whether the defendant agents had probable cause to believe an offense had occurred so as to justify the subsequent detention, arrest, search, and seizure.
The Louisiana Supreme Court in State v. Arceneaux, supra, stated that:
"Reasonable cause, which we have treated under this article as consonant with the probable cause concept, exists when the facts and circumstances known to the arresting officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution in believing that the person to be *1264 arrested has committed a crime. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); State v. Drew, 360 So.2d 500 (La.1978). Probable cause may be judged by the probabilities and practical considerations of everyday life on which average men, and particularly average police officers, can be expected to act. State v. Drew, supra. Compliance with these standards is in the first instance a substantive determination to be made by the trial judge from the facts and circumstances of the case. Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); State v. Drew, supra.

In this case, Patrick Damas Moresi and Kern Alleman were finally cited with possession of untagged migratory game birds in violation of 50 C.F.R. 20.36, which provides that:
"No person shall put or leave any migratory game birds at any place (other than at his personal abode), or in the custody of another person for picking, cleaning, processing, shipping, transportation or storage (including temporary storage), or for the purpose of having taxidermy services performed unless such birds have a tag attached, signed by the hunter, stating his address, the total number and species of birds, and the date such birds were killed. Migratory game birds being transported in any vehicle as the personal baggage of the possessor shall not be considered as being in storage or temporary storage."
Defendants contended at trial that they had probable cause to believe that this statute was being violated because they were not aware that birds being transported as part of a person's personal baggage were exceptions to the tagging requirement.
Defendant/appellants argued that the conduct of Patrick Damas Moresi and Kern Alleman constituted a technical violation of this statute, because the statutes forbids a person from putting or leaving migratory game birds at any place. This is an absurd interpretation of the statute which would require hunters to tag birds as they fall out of the sky. When one reads the statute as a whole rather than piecemeal it is clear that the statute is meant to prohibit a hunter from putting or leaving untagged birds outside of his own custody for picking, cleaning, processing, shipping, transportation, storage or taxidermy purposes.
Probable cause cannot be brought into existence by an officer's mistaken belief that a certain course of conduct constitutes an offense, where the conduct is, on its face, lawful. As the court stated in Loe v. Whitman, 107 So.2d 536 (La.App. 1st Cir.1959):
"The public is not to be subjected to arrest and harrassment by enforcement officers for acts which are erroneously deemed by the officers to constitute offenses when, in reality, they are not, as would have been disclosed by a casual investigation. Ignorance of the law, as has often been stated, is no excuse. This should have particular application to the officers charged with its enforcement. A thorough knowledge of their duties and of the laws they are charged with enforcing are indispensable. We think it would be going to unreasonable lengths to hold that a citizen cannot complain and cannot proceed for redress for actions of force and violence because he may have been considered by the officers to have violated the law, when, in fact, there was no law and no violation, which the officers could and would have ascertained on making the slightest investigation or familiarizing themselves with the provisions of the statute upon which they relied." (Emphasis supplied.)
Even a cursory reading of 50 C.F.R. 20.36 reveals that Patrick Damas Moresi and Kern Alleman committed no violation. As was stated in the Loe case, ignorance of the law is no excuse. The ignorance of these agents and their subsequent acts are particularly inexcusable since they were repeatedly put on notice that no offense occurred. Under the circumstances, their ignorance can certainly not be a basis for probable cause.
*1265 Appellants further assert they could have established probable cause to arrest, search and seize had the trial judge allowed them to introduce evidence that birds shot in the previous day's hunt could have been left at the camp untagged overnight. Appellants contend that this would have constituted a violation of 50 CFR 20.36. However, the testimony at trial indicates that this interpretation of events did not arise until later in the day, well after Moresi and Alleman had been cited when Agent Schriefer called Agent Sims to verify that he had properly cited Moresi and Alleman. Probable cause is not retroactive. The existence of probable cause must be determined by facts and circumstances known to the officer at the time of the arrest, or search not on justifications for prior conduct worked out after the fact. Accordingly, the trial judge correctly ruled this evidence irrelevant.
Appellants further attempt to justify the search of the Alleman boat by arguing that the agents had probable cause to believe that Patrick Damas Moresi and Kern Alleman were in violation of the boating safety requirement that life jackets be readily accessible. Therefore, they argue a search was allowable under La.R.S. 56:55(A). The provisions of La.R.S. 56:55 do not give officers a carte blanche to conduct a general exploratory search. See: Creamer v. Porter, 754 F.2d 1311 (5th Cir. 1985), and U.S. v. Kidd, 153 F.Supp. 605 (D.C.La.1957). In this case such a search was not needed to investigate a life jacket violation, if such a violation was indeed in the agent's mind at that time.
ASSIGNMENT OF ERROR NO. 2
We need not reach this assignment of error since the ruling complained of occurred during a proffer of evidence, which the trial judge ruled irrelevant. We have already found that the trial judge's ruling as to relevance was correct and the evidence which was the subject of the proffer was correctly excluded.
ASSIGNMENT OF ERROR NO. 5
By this assignment of error appellants argue that the trial judge erred in finding that Agents Meaux and Guillory were negligent in leaving the note at the Moresi-Alleman Camp.
The trial judge found that the two agents were liable under La.C.C. art. 2315. "Proof of negligence is a question of fact to be determined by the judge or jury. While appellate courts maintain jurisdiction over factual determinations, trial court decisions are only to be altered in light of manifest error. Buxton v. McKendrick, 223 La. 62, 64 So.2d 844 (1953)." Henry v. State, Department of Health and Human Resources, 482 So.2d 962 (La.App. 3rd Cir. 1986). In light of the evidence brought out at trial we cannot find that the trial judge was manifestly erroneous. Therefore this assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 6
Appellants next argue that the attorney's fees awarded by the trial court were excessive. Three attorneys worked on plaintiffs' case. After a careful review of the time sheets introduced in support of the fees we find that some of the billing is redundant. As a result of the elimination of these redundancies, we find that a fee of $30,091.00 is appropriate. Defendants, of course, continue to be liable for court costs at the trial level.
ASSIGNMENT OF ERROR NO. 7
Finally, appellants argue that the court erred in awarding punitive damages. The issue of whether punitive damages may be awarded in a suit brought under 41 U.S.C. § 1983, in the Louisiana State Courts, was directly addressed by our Louisiana Supreme Court in Ricard v. State, 390 So.2d 882 (La.1980). In that case the Court clearly ruled that such damages are not allowable under our law. Absent legislative or judicial overturning of this decision, we are bound by it. Therefore, the award of punitive damages by the trial court is overturned.
CONCLUSION
For the foregoing reasons the trial court's awards of damages for the negligence of Agents Meaux and Guillory and *1266 its award of general damages for the actions of Agents Schriefer, Vaughn, Breaux and Jukes are affirmed. The award of punitive damages is reversed. The award of attorney's fees is reduced to $30,091.00. Costs of this appeal are to be paid by defendant/appellants.
AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART.
LABORDE, J., concurs in the result.
STOKER, J., dissents and assigns written reasons.
STOKER, Judge, dissenting.
With respect I dissent from the majority ruling which affirms the trial court. The trial court's judgment relative to the State and Agents Schriefer, Jukes, Breaux and Vaughn is predicated in large part on a holding that the State's agents actually made arrests in this case. With due respect to the trial court's holding and the majority's affirmance, I disagree that an arrest, rather that a lawful detention, did take place. In my view the other incidents associated with the agents' actions on January 11, 1985 were lawful, and the business card incident was without legal consequence. I would reverse and dismiss the plaintiffs' suit for the reasons discussed hereinbelow.

I.

FALSE ARREST
Patrick Moresi and the parents of Kern Alleman claim that the events which occurred on January 11, 1985 constituted false arrest or false imprisonment entitling them to damages under LSA-C.C. art. 2315. Initially in the defense of this matter, the defendants took the position that no arrest had taken place. However, at trial and now before this court, the defendants argue that the agents' actions were supported by probable cause and are therefore within the constitutional requirements of probable cause for warrantless arrests, searches and seizures. I believe that the critical determination in this case, despite the arguments of the parties, is whether plaintiffs have proven that an arrest occurred. In light of this, it seems to me to be unnecessary to address the many issues concerning probable cause discussed by the defendants. Instead, I consider that proof of the fact of an arrest should be our threshold inquiry.
A false arrest or false imprisonment occurs when a person is arrested and restrained against his will by one who acts without a warrant or other statutory authority. Johnson v. State, Through the Department of Public Safety, 451 So.2d 104 (La.App. 3d Cir.1984), writ. denied, 457 So.2d 15 (La.1984). In order to prevail in this action, the plaintiff must show (1) an arrest and restraint, and (2) the unlawfulness of the arrest.
"An arrest occurs when the circumstances indicate an intent to effect an extended restraint on the liberty of the accused, rather than at the precise time the officer tells the accused he is under arrest. Neither the defendant's subjective impression nor the formality of an official arrest will be determinative of the issue of a claimed illegal arrest." State v. Trent, 517 So.2d 1053 (La.App. 3rd Cir.1987), writ denied, 519 So.2d 114 (La.1988)
The detention complained of in this case was for approximately 45 minutes to one hour. All of the agents involved testified that Patrick and Kern were not free to leave, once the agents had ascertained that there was a possible violation, until the investigation was complete and citations were issued. Patrick testified that the agents did not tell them that they were under arrest. He testified that they were not handcuffed or frisked, nor were their guns taken from them. Agent Schriefer testified that the young men were detained, but in his belief they were not under arrest. Patrick and Kern were read their Miranda warnings; however, that fact is not determinative of an arrest. Miranda warnings are required in custodial situations falling short of a formal placing under arrest. State v. Menne, 380 So.2d 14 (La.1980).
*1267 In the recent case of United States v. Sylvester, 848 F.2d 520 (5th Cir.1988), the defendants, convicted of hunting violations, argued that certain statements made to federal agents should have been suppressed because they were not given their Miranda warnings. The court found that though the hunters were detained, questioned, gathered together to discuss their citations and their vehicles blocked by the agents' vehicles, the hunters could have properly presumed that they would be allowed to continue on their way once citations were issued. The court held that the detention was not custodial in nature, thus no Miranda warnings were required. The court relied on the case of Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) in reaching its decision.
As I view it, the facts presented here constitute no greater restraints than those presented in the Sylvester case. The hunters in Sylvester were detained and their detention did not constitute even a custodial detention, much less an arrest. I do not find that the circumstances surrounding the detention of Patrick Moresi and Kern Alleman indicate that the agents intended to effect an extended restraint on the young men's liberty or an intent to formally arrest them. In fact, a citation or summons was issued instead of effecting an arrest. The young men were experienced hunters who had been stopped and checked before by wildlife agents, and they could have properly presumed that they would be allowed to continue on their way once the citations had been issued. I believe that the trial court was clearly wrong in finding that the plaintiffs, Patrick Moresi and Kern Alleman, had been illegally arrested and in awarding damages.

II.

42 U.S.C. SECTION 1983

(A) SEIZURE
While I would find that there was no arrest in this case for purposes of a tort action under LSA-C.C. art. 2315, a stop and detention may constitute a seizure violative of rights guaranteed by the Fourth Amendment of the United States Constitution and Article 1 Section 5 of the Louisiana Constitution. Whenever a law enforcement officer accosts an individual and restrains his liberty to walk away, that individual has been seized. The Fourth Amendment proscribes unreasonable seizures, therefore any seizure must be analyzed in terms of its reasonableness, i.e., by balancing the need to seize against the invasion which the seizure entails. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In balancing these concerns, one consideration must be to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions at the unconstrained discretion of law enforcement officers. To insure this, usually some question of particularized or individualized suspicion is required as a prerequisite to a constitutional seizure. However, a seizure lacking this may nonetheless be constitutionally permissible if carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual law enforcement officers. Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).
In light of the principles articulated above, I think we should examine the actions of the agents to determine whether they were constitutionally permissible or violative of the parties' constitutional rights. The testimony in the record before us shows that on January 9, 1985 Agents Vaughn and Nunez were notified by Major Charles Savage that there had been complaints about a certain individual, Byron Begnaud, bringing in more than his allowed limits of ducks at Stelly's Landing. The agents were assigned, along with Breaux, Jukes and Schriefer, to investigate. The agents went out to the landing on January 10, but did not see Mr. Begnaud. The agents met again in the early morning hours of January 11 and decided to position themselves at the three different landings for purposes of checking compliance with hunting and boating regulations. It was decided that all hunters coming *1268 in would be stopped and checked as it was the last day of the duck hunting season. Pursuant to this plan, the agents stationed themselves at the landings. At Stelly's Landing, all hunters were stopped and checked. Patrick and Kern were the third such group to be stopped and others were stopped after them. All parties were checked for compliance with hunting and boating regulations.
It is within the authority of the agents of the Louisiana Department of Wildlife and Fisheries to enforce the regulations concerning ships and watercraft, LSA-R.S. 34:851.29, and to enforce regulations concerning hunting and fishing, LSA-R.S. 56:54; 56:55.2 and 56:103. Agents are authorized to stop and board any vessel to check for compliance with boating regulations and are required to check hunters to ascertain whether they have valid hunting licenses in their possession. This authority is analogous to that given to police officers to demand of someone operating an automobile that they show a valid driver's license, proof of liability insurance, vehicle registration and a vehicle inspection sticker. The manner in which these regulations are enforced has not been the subject of litigation in Louisiana. The only issue which has been dealt with is the constitutionality of sobriety checkpoints. Checkpoints set up solely for the purpose of discovering intoxicated drivers have been held to be unconstitutional. State v. Church, 532 So.2d 107 (La.1988). The issue then before us, whether checkpoints conducted by wildlife agents for the purpose of enforcing wildlife and boating regulations, is one of first impression.
The United States Supreme Court has dealt with the issue of automobile checkpoint stops and the balancing considerations involved. United States v. Martinez-Fuerte, supra. The Supreme Court has held that random stops of persons and automobiles without any individualized suspicion are unreasonable. See United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Brown v. Texas, supra; Delaware v. Prouse, supra. However, in Martinez-Fuerte, the Court held that routine checkpoint stops of automobiles at the U.S.-Mexican border are not unreasonable. The court found that the need to make such stops is great and the consequent intrusion on the public is limited. The court found that such routine checkpoint operations involve less discretion in individual officers and decisions concerning the checkpoints are not made by the officers in the field.
In determining whether the checkpoint conducted by the agents in this case and such checkpoints in general are reasonable, we should look for guidance to other reported cases. Other cases found involve checkpoint stops on public highways for the purpose of checking compliance with hunting laws and general traffic laws. In State v. Halverson, 277 N.W.2d 723 (S.D. 1979), the Supreme Court of South Dakota held that game checkpoints on public roads are reasonable intrusions upon the motoring public. In so holding, the court reasoned that because wild animals are the property of the state, the citizens of the state have an interest in the effective management and conservation of wildlife. The only effective means to enforce game laws is by the use of roadblocks or checkpoint stops in game areas. The court stated that, "Since it is a privilege to hunt wild game, a hunter tacitly consents to the inspection of any game animal in his possession when he makes application for and receives a hunting license." Id. at 725. The court concluded that in the particular factual circumstance concerning the issuance of a traffic citation to a non-hunter, "[t]he intrusion into the right of the non-hunter to the uninterrupted use of the highways is slight and greatly outweighed by the public interest in the management and conservation of wildlife in this state." Id. at 725.
In State v. Tourtillott, 289 Or. 845, 618 P.2d 423 (1980), cert. denied, 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 352 (1981), the Oregon Supreme Court considered the same type of roadblock; in this case set up on a rural road on the opening day of hunting season. The defendant, a non-hunter, was cited for driving with a revoked license and subsequently convicted *1269 of the offense. The court held the roadblock was reasonable finding that its operation was much the same as that in United States v. Martinez-Fuerte. See also, Drane v. State, 493 So.2d 294 (Miss.1986), cert. denied, 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 677 (1987).
The checkpoint in this case was set up at the directive of a major (Charles Savage) in the Department of Wildlife and Fisheries, it was located at a public landing used by duck hunters coming in from the marshes, it was done on the last day of duck hunting season and the same practices were employed in stopping and checking all boats coming into the landing. While there were no warning signs indicating the agents' presence and the agents were in an unmarked vehicle, the agents identified themselves to incoming hunters and were easily identifiable as wildlife agents. I am of the opinion that the stop in this case, limited to those persons coming into the landing for the purpose of checking compliance with hunting and boating regulations, was much less intrusive than those sanctioned by the South Dakota and Oregon Supreme Courts. It was reasonable for the agents to infer that incoming boats belonged to hunters who owned or used hunting camps in the marsh and who had been hunting. The fact that they operated boats brought them within the purview of applicable state boating regulations. The only discretion that was left to the agents in this case was which agents would be stationed at which landing and the decision to also check Little Prairie and Pecan Island.
In weighing the balance between the public interest in the enforcement of wildlife management and conservation laws and the individual's right to personal security, I find that the former clearly outweighs the latter in this case. The method of enforcement employed in this case was a reasonable intrusion dictated by the nature of the activity (hunting in the marsh) and the State's limited resources and personnel available for enforcement of the laws. In my opinion the plaintiffs failed to prove that the stop was unreasonable under the Fourth Amendment and Article 1 Section 5 of the Louisiana Constitution.

(B) SEARCH
The plaintiffs additionally complain that the agents' search of the locked forward compartment of Dr. Alleman's mud boat and the search of two ice chests were unreasonable and in violation of the Fourth Amendment and Article 1 Section 5 of the Louisiana Constitution.
As pointed out in the previous discussion, wildlife agents have the authority to board any vessel and examine it for compliance with boating regulations. Agent Jukes testified that there were no life preservers in view or readily accessible as required by law, LSA-R.S. 23:851.24 F(1), and the purpose of the search was to discover whether there were life preservers on board the boat. Patrick Moresi testified that the life preservers were in the locked forward compartment.
As concerns the two ice chests, the ice chest in the bow of the boat was in the possession and control of Patrick and Kern. When asked what its contents were the young men responded that it contained ducks. The second ice chest which was searched incidental to the agents' investigation was sitting outside of the hunting camp and was empty.
In general, a search of private property must be both reasonable and performed pursuant to a properly issued search warrant. Arkansas v. Sanders, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). When a closed container is surrounded by a reasonable expectation of privacy in its contents, a warrant is required in order for it to be searched. State v. Cunningham, 412 So.2d 1329 (La.1982). Whether one has a reasonable expectation of privacy in a thing is determined by considering whether there was an actual or subjective expectation of privacy and also whether the expectation is one which society at large is prepared to recognize as reasonable. State v. Lambright, 525 So.2d 84 (La.App. 3d Cir. 1988). However, not all containers and packages will be afforded Fourth Amendment protections. Some containers by their very nature cannot support any reasonable *1270 expectation of privacy because their contents can be inferred by their outward appearance. 442 U.S. at 765 n. 13, 99 S.Ct. at 2593 n. 13; State v. Cunningham, supra.
An ice chest is used for the transport and storage of food and drink. It is not the sort of container such as a suitcase, purse, briefcase or other similar repository of personal effects which is inevitably associated with an expectation of privacy. The parties did not object to the search of the ice chests and in no manner exhibited any type of objective notice that they had an expectation of privacy in the containers. Moreover, Patrick and Kern told the agents what was in the ice chest on the boat, thereby demonstrating no expectation of privacy in the container. I do not think that an ice chest used by these hunters under these circumstances can be considered a "common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy." Arkansas v. Sanders, 442 U.S. at 761, 99 S.Ct. at 2591.
It is my opinion that the Fourth Amendment and Article 1 Section 5 of the Louisiana Constitution do not extend protection to the ice chests in this case. Accordingly, I conclude that there was no unreasonable search or violation of plaintiffs' constitutional rights.

THE BUSINESS CARD INCIDENT
The plaintiffs allege that the business card left at their camp by Agents Guillory and Meaux was a direct threat to them. The allegedly threatening statement was, "We missed you this time but look out next time!!"
In deciding whether the actions of Agents Meaux and Guillory constituted a tort, actionable under LSA-C.C. art. 2315, it is immaterial that the message was intended for someone else. If the message constituted a threat and thereby harmed the recipient, whether intended or not, a tort was committed.
A threat, as defined by Black's Law Dictionary, Revised Fourth Edition at 1651, is:
"A declaration of intention or determination to inflict punishment, loss, or pain on another, or to injure another by the commission of some unlawful act. U.S. v. Daulong, D.C.La. 60 F.Supp. 235, 236. A menace; especially, any menace of such a nature and extent as to unsettle the mind of the person on whom it operates, and to take away from his acts that free and voluntary action which alone constitutes consent. Abbott, United States v. French, D.C.Fla., 243 F. 785, 786; State v. Brownless [Brownlee] 84 Iowa 473, 51 N.W. 25. Cote v. Murphy, 159 Pa. 420, 28 A. 190, 23 L.R.A. 135, 39 Am.St.Rep. 686. A declaration of one's purpose or intention to work injury to the person, property, or rights of another, with a view of restraining such person's freedom of action. McKenzie v. State, 113 Neb. 576, 204 N.W. 60, 61. Kamenitsky v. Corcoran, 177 App.Div. 605, 164 N.Y.S. 297, 300."
Even considered in its most "threatening" light, I cannot find that the statement made by Agents Meaux and Guillory constituted a threat. At most, it could be construed as a warning that they would be doing their job enforcing compliance with hunting and fishing laws. Moreover, plaintiffs failed to prove that it was taken seriously by them as a threat. They hunted and fished as frequently as they had in the past, used the camp as frequently and even improved the property. Plaintiffs did not demonstrate any fear for their personal safety or any diminishment in their enjoyment and use of their camp. In my opinion the message can in no way be construed as a threat or constituting any other tortious act. I think that the trial judge was clearly wrong in awarding judgment in favor of plaintiffs. I find that plaintiffs failed to prove by a preponderance of the evidence any violation of their constitutional rights or other tortious acts committed by the agents in this case.