Dear Mr. Scott:
Your opinion request regarding highway solicitations and the Town of Pollock's liability therefore has been forwarded to me for response.
While it is illegal to solicit on an interstate highway (see LSA 14:97.1, attached), Louisiana law does permit certain groups, including professional firefighters associations and non-profit organizations, to solicit contributions from a public roadway subject to the permission ofthe municipality. (See LSA-R.S. 32:218, attached). Attorney General Opinion Number 98-487, based upon the then-existing law, previously opined that solicitation by any group was prohibited. To the extent that LSA-R.S. 32:218 (attached) was amended in 1999 to allow certain groups to engage in this activity, Attorney General Opinion 98-487 has been statutorily superceded.
The permission of the municipality is properly given by issuing a permit, with whatever restrictions the municipality deems appropriate according to the circumstances. It is certainly appropriate for the municipality, as a requirement for the issuance of a permit such as this, to require the applicant to include a waiver of liability for the requested activity. There are virtually any number of conditions that the municipality could attach to the permit — for example, specific date and duration of the activity, specific location of the activity, number of participants near the roadway at any given time, a requirement that the participants wear orange safety vests, a requirement that a designated person provide safety briefings prior to the activity, age of participants, etc. Any of these conditions would: a) provide the municipality with peace of mind that the activity would be conducted safely; and, b) serve as evidence that the municipality did, in fact, act prudently in the issuance of the permit.
Regarding the potential liability of the municipality's officers, employees, or board members, I've attached a prior Attorney General's Opinion, Number 02-0240, which addresses the liability of a law enforcement officer. In that opinion is a discussion of LSA — 9:2798.1 (also attached) which provides immunity to officers and employees of public entities "based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties." A similar statute, LSA — 9:2792.4, provides immunity to members of a board, commission, or authority of a political subdivision. While the language is not exactly the same, section B states:
 "A person who serves as a member of a board, commission, or authority of a political subdivision as defined in Subsection A, shall not be individually liable for any act or omission resulting in damage or injury, arising out of the exercise of his judgment in the formation and implementation of policy while acting as a member of a board, commission, or authority of that political subdivision, provided he was acting in good faith and within the scope of his official functions and duties, unless the damage or injury was caused by his willful or wanton misconduct."
I trust this answers your inquiry. Please feel free to contact this office for assistance in the future.
Yours very truly,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 ______________________________ THOMAS L. ENRIGHT, JR. Assistant Attorney General
RPI/TLE:dsc Enclosures
OPINION NUMBER 98-487
December 29, 1998
61-2 LAWS Fair Trade — Consumer Fraud LSA-R.S. 14:97.1 LSA-R.S. 32:218
We conclude that it is unlawful for charitable organizations to solicit funds on public roadways.
Honorable Spencer Williams Chief of Police Ball Police Department P.O. Box 800 Ball, Louisiana 71405
Dear Mr. Williams:
This office is in receipt of your opinion request of recent date wherein you ask whether it is legal for charitable organizations, volunteer organizations, school or other civic groups to solicit funds on public roadways for the purpose of raising monies. You also inquire, if such activities are legal and authorized by the State of Louisiana, can the municipality require a permit or prior authorization before said groups can engage in these fund raising activities upon state, parish or municipal roadways?
LSA-R.S. 14:97.1 clearly states that solicitation on an interstate highway or the entrance or exit ramp of an interstate highway is a crime punishable by a fine of not more than $200.00 and imprisonment of not more than six months or both.
LSA-R.S. 32:218 states that no person shall stand on a roadway for the purpose of soliciting a ride, employment or business from the occupant of any vehicle.
A municipality can prevent such groups from engaging in fund raising activities upon parish or municipal roadways. The City of Baton Rouge and the Parish of East Baton Rouge enacted an ordinance which withstood constitutional muster. The preamble to the ordinance reads:
"Whereas, a problem has been identified with persons attempting to solicit rides, employment, business or charitable contributions from the occupants of moving vehicles or certain city streets; and
"Whereas, this practice has been identified as being unsafe for both the person engaging in the solicitation and for traffic in general; and
"Whereas, the activity of soliciting rides, business, employment, or charitable contributions from the occupants of vehicles constitutes an impediment to the normal and safe flow of traffic in the City of Baton Rouge; and
"Whereas, this activity has in the past resulted in accidents one of which resulted in the death of the person engaged in the soliciting activity, Section 96(b) provides:
 "No person shall be upon or go upon any street or roadway or shall be upon or go upon any shoulder of any street or roadway nor shall any such person be upon or go upon any neutral ground of any street or roadway for the purpose of soliciting employment, business or charitable contributions of any kind from the occupant of any vehicle."
The International Society of Krishna Consciousness of New Orleans, Inc., a religious organization, with First Amendment protection challenged this ordinance in federal court, Middle District of Louisiana. The City of Baton Rouge prevailed and the decision was affirmed at the Fifth Circuit Court of Appeals. See The International Society of Krishna Consciousnessof New Orleans, Inc. v City of Baton Rouge and Parish of East BatonRouge, 668 F. Supp. 527 (1987) and The International Society of KrishnaConsciousness of New Orleans, Inc. v City of Baton Rouge and Parish ofEast Baton Rouge, 876 F.2d 494 (1989). Both courts agreed that this practice cannot be made safe. The ordinance was deemed "content-neutral", in that it applies even-handedly to every organization or individual regardless of viewpoint. The ordinance also meets the governmental safety interest. "The direct solicitation from drivers distracts them from their primary duty to watch the traffic and potential hazards of the road, observe all traffic control signals or warnings and prepare to move through the intersection." Krishna, supra, p. 498.
Therefore, it is clear that the practice of soliciting funds from occupants in vehicles is prohibited in the State of Louisiana on interstate highways and state roadways. A municipality can enact an ordinance which seeks to restrict or modify the activity in question on City or Parish roadways. The City of Baton Rouge's ordinance has withstood a constitutional challenge and therefore, is a good model to follow. The federal court opinion does not address permitting such an unsafe activity. It would not be within the municipality's best interest to issue a permit for such an unsafe activity.
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: __________________________ KORDICE M. DOUGLAS ASSISTANT ATTORNEY GENERAL
KMD:ta
OPINION NUMBER 02-0240
September 13, 2002
107 SHERIFFS — Constables Marshals, including Ex-Officio Tax Collectors, rights, powers and duties, in general
A Constable is a law enforcement officer entitled to qualified immunity for certain acts committed in the course and scope of employment.
Constable William E. Maddox First Justice of the Peace Court 136 Boone Road Haynesville, LA 71038
Dear Constable Maddox:
Your opinion request, listing three questions regarding the outcome of hypothetical litigation brought against you as a Constable for the performance of your legal duties, has been forwarded to me for response. As the outcome of any litigation is fact-specific and dependent upon current law, we cannot definitively predict the outcome of such an action. However, we will provide a synopsis of the statutory and jurisprudential protections conferred upon public officers acting within the course and scope of their duties.
Specifically, you ask:
 1. Is the Constable afforded any protection under state law for performing his legal and lawful duties?
 2. Is the Constable afforded any protection under state law from the victim for failure to perform his legal and lawful duty?
 3. If civil action is brought by either the defendant or victim, who would defend the Constable for the lawful performance of his duty or lack thereof?
Initially, we note that Constables are considered "peace officers" under various Louisiana statutes and previously issued Attorney General Opinions, and are entrusted with a myriad of law enforcement powers. I have enclosed Attorney General Opinion 01-418, which discusses a constable's law enforcement powers, duties, and responsibilities.
Persons who claim violations of the U.S. Constitution typically file an action under 42 U.S.C. § 1983, which is commonly called a "1983 action." The Louisiana Supreme Court, in Moresi v. State Through Dept.of Wildlife and Fisheries, 567 So.2d 1081 (La. 1990) set forth the applicable standard for determining whether public officers are entitled to absolute or qualified immunity for alleged constitutional violations committed under color of state law. In that case, the Louisiana Supreme Court concluded that officials performing functions integral to the judicial process or traditional legislative functions are absolutely immune from § 1983 damage liability for actions performed in those capacities and, in general, a qualified immunity applies to most acts of government officials. (Copy enclosed).
Under state law, liability is not imposed upon officers and employees of public entities based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties. See LSA R.S. 9:2798.1 (copy enclosed). Also, for law enforcement officers prosecuted for alleged criminal conduct, LSA 42:1442 requires a local governing authority to reimburse the law enforcement officer's reasonable attorney fees if "[he] is acquitted of the charge, the prosecution has been dismissed by the district attorney, or the periods of time have expired in which he could be brought to trial and convicted." (Copy enclosed).
On the issue of representation, LSA R.S. 13:2593 authorizes the Attorney General to "[provide] legal representation to a justice of the peace or a constable of this state in all claims, demands, or suits, if such claim, demand, or suit arises out of the discharge of his duties and within the course and scope of his office and the claim, demand, or suit did not result from his intentional wrongful act or gross negligence." (Copy enclosed).
The statutes and jurisprudence cited above represent the well-intentioned attempts by the legislature and judiciary to insulate good-faith public officials acting in the course and scope of their employment from groundless litigation. However, as litigation and people's conduct is at times unpredictable, the legislature has also enacted statutory requirements that public officers shall secure general liability insurance coverage on themselves and their officers and employees in amounts of not less than twenty thousand dollars per injured person. See LSA 42:1441.2 (copy enclosed). Therefore, we advise you to confirm that you are, in fact, covered by such a general liability insurance policy.
I trust this addresses your request for information. Please feel free to call this office if you require assistance in the future.
Yours very truly,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 ______________________________ THOMAS L. ENRIGHT, JR. Assistant Attorney General
RPI/TLE:dsc
Enclosures
Date Released: September 13, 2002
OPINION NUMBER 01-418
January 22, 2002
107 — SHERIFFS, CONSTABLES MARSHALS
A constable is considered a peace officer and therefore may apply for grants dealing with law enforcement.
Major Reginald R. Brown Baton Rouge City Constable P.O. Box 1471 Baton Rouge, LA 70821
Dear Major Brown:
Your letter of October 2, 2001, requesting the opinion of this office regarding the jurisdiction of the City Constable's office has been assigned to me for disposition. The question, as we understand it, is whether and to what extent the Baton Rouge City Constable is considered a "peace officer" and whether the office has the authority to apply for grants dealing with law enforcement.
This office has previously determined that Louisiana law recognizes a city constable as a peace officer. In La. Op. Atty. Gen. No. 97-109, this office was of the opinion that a constable has the authority to issue citations for the careless operation of a vehicle provided that the offense was committed in the constable's presence. Furthermore, in La. Op. Atty. Gen. No. 81-984, this office determined that a constable could issue citations for littering when the offense is committed in the presence of the constable.
These opinions are in line with the legislation dealing with the definition of "peace officer" as used in Louisiana law. For example, comment (a) of Article 204 of the Code of Criminal Procedure, describes the term "peace officer" as including constables and their deputies. Additionally, LSA-R.S. 40:2402 defines the term peace officer as:
 . . . [A]ny full-time employee of the state, a municipality, a sheriff, or other public agency, whose permanent duties actually include the making of arrests, the performing of searches and seizures, or the execution of criminal warrants, and is responsible for the prevention or detection of crime or for the enforcement of the penal, traffic, or highway laws of this state, but not including any elected or appointed head of a law enforcement department.
These two provisions conform to the legislatively mandated duty of the Baton Rouge City Constable. The office of City Constable for the City of Baton Rouge was established in Act 169 of 1898. Section 17 of the Act prescribed the duties of the City Constable stating, in pertinent, part, that "all the powers and functions conferred by the Constitution and laws upon constables shall be exercised and vested in a city constable, who shall moreover be vested with the powers of a city policeman."
The "powers and functions conferred by law" are described in LSA-R.S.13:1881. That statute provides that the constable is the executive officer of court. As the executive officer of the court, the constable is charged with the duty of executing writs and warrants issued by the city court. The statute also grants to the constable the power to make arrests and preserve the peace, thus expressing that the city constable does have "law enforcement" powers in the execution of the duties of his office. Therefore, even though the office of constable is primarily a judicial office, during the execution of court orders, the constable has the same powers and authority as that of a sheriff.
As the executive officer of the court, the constable must serve and execute all process directed to them by the city court judge. When executing arrest warrants issued by the court, the constable has both arrest as well as search and seizure power. Since this duty clearly falls within the type of conduct described in LSA-R.S. 40:2402, it is apparent that the Baton Rouge City Constable is a "peace officer" during the execution of his official duties.
The constable's peace officer powers, duties, and responsibilities are, however, limited to the jurisdiction of the city court for which he serves. Act 944 of the 2001 Regular Session extends the criminal jurisdiction of city courts to both state offenses and offenses under a municipal or parochial ordinance committed within the territorial jurisdiction of the court and are not punishable by imprisonment at hard labor.
Under the authority cited above, it is the opinion of this office that the Baton Rouge City Constable is a peace officer and accordingly may apply for grants dealing with law enforcement. We hope that this opinion sufficiently answers your question. If you should have any further questions, please feel free to contact us.
Sincerely,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: ___________________________________ CHARLES H. BRAUD JR. ASSISTANT ATTORNEY GENERAL
9:2792.4. Limitation of liability of members of boards, commissions, orauthorities of political subdivisions
A. As used in this Section, a "member of a board, commission or authority of a political subdivision" means a person serving as an elected or appointed director, trustee, or member of a board, commission, or authority of a municipality, ward, parish, or special district, board, or commission of the state, including without limitation, a levee district, school board, parish law enforcement district, downtown development district, tourist commission, port commission, publicly owned railroad board or commission, or any other local board, commission, or authority.
B. A person who serves as a member of a board, commission, or authority of a political subdivision as defined in Subsection A, shall not be individually liable for any act or omission resulting in damage or injury, arising out of the exercise of his judgment in the formation and implementation of policy while acting as a member of a board, commission, or authority of that political subdivision, provided he was acting in good faith and within the scope of his official functions and duties, unless the damage or injury was caused by his willful or wanton misconduct.
Acts 1987, No. 667, § 1; Acts 1988, No. 734, § 1.
9:2798.1. Policymaking or discretionary acts or omissions of publicentities or their officers or employees
A. As used in this Section, "public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
D. The legislature finds and states that the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the Constitution of Louisiana.
Acts 1985, No. 453, § 1; Acts 1995, No. 828, § 1, eff. Nov. 23, 1995.
32:218. Pedestrians soliciting rides or business
A. No person shall stand on a public roadway for the purpose of soliciting a ride, employment, or business from the occupant of any vehicle.
B. Subject to the permission of the municipality or parish governing authority in which the roadway is located, a member of a professional firefighters association or other nonprofit organization shall not be prohibited by this Section nor any other provision of state law from standing on a public roadway for the purpose of soliciting contributions, as a member of such association, on behalf of bona fide charitable organizations.
Acts 1962, No. 310, § 1; Acts 1999, No. 1132, § 1, eff. July 1, 1999.
14:97.1. Solicitation on an interstate highway
A. Solicitation on an interstate highway is the intentional act of soliciting, begging, panhandling or otherwise requesting anything of value on any interstate highway, or on any entrance or exit ramp of an interstate highway.
B. Whoever commits the crime of solicitation on an interstate highway shall be fined not more than two hundred dollars, or imprisoned for not more than six months, or both.
Acts 1997, No. 1099, § 1.
 MORESI v. DEPT. OF WILDLIFE FISHERIES, 567 So.2d 1081 (La. 1990) PATRICK DAMAS MORESI, ET AL. v. STATE OF LOUISIANA, THROUGH THE DEPARTMENT OF WILDLIFE AND FISHERIES, ET AL. No. 90-C-0205. Supreme Court of Louisiana. September 6, 1990. Rehearing Denied October 4, 1990.
APPEAL FROM FIFTEENTH JUDICIAL DISTRICT COURT, PARISH OF VERMILION, STATE OF LOUISIANA. *West Page 1082 
Arthur I. Robison, Nora M. Stelly, Allen Gooch, Lafayette, for State of La., through the Dept. of Wildlife and Fisheries, et al., for defendants-applicants.
Lawrence W. Moon, Jr., Asst. U.S. Atty., for Kash Schriefer, Ivan Vaughn, Jr., Larry Breaux, and James O. Nunez, for defendants-applicants.
Paul G. Moresi, Jr., Moresi Moresi, Abbeville, for Patrick Damas Moresi, Kern Alleman, Paul G. Moresi, and Howard Alleman, for plaintiffs-respondents.
Richard C. Broussard, Domengeaux Wright, Lafayette, Charles R. Sonnier, Sonnier, Hebert, Cabes Hebert, Abbeville, for Patrick Moresi, et al., for plaintiffs-respondents.
DENNIS, Justice.*
* Judge Melvin A. Shortess of the First Circuit Court of Appeal participated in this decision as Associate Justice Pro Tempore.
[1] In this civil rights action by the plaintiff duck hunters against the state and its game agents for damages caused by *West Page 1083 
unconstitutional arrests, searches and seizures, the principal questions are whether the agents' conduct violated clearly established
constitutional rights in (1) stopping duck hunters for questioning in their mudboat, (2) searching ice chests and a boat compartment, (3) arresting hunters for failing to comply with duck tagging regulations, (4) seizing untagged game in the hunters' possession, and (5) detaining the arrested hunters 45 to 60 minutes and requiring them to take two of the officers in the mudboat to the hunters' duck camp. After a bench trial, the district court entered judgment in favor of the hunters against the state and the game officers for actual damages, punitive damages, and attorneys' fees. The court of appeal affirmed in the main but vacated the punitive damage award and reduced the attorneys' fees.Moresi v. Dept. of Wildlife Fisheries, 552 So.2d 1259 (La.App. 3d Cir. 1989). We reverse the judgment entirely and dismiss the plaintiffs' suit.
[2] On January 11, 1986, the last day of duck hunting season in Louisiana's western zone, four game agents of the state Wildlife and Fisheries Commission converged on Stelly's Landing and Little Prairie Landing in Vermilion Parish to watch for game violators. Several of these state game agents were also commissioned as deputy federal agents. the agents were acting on a tip that a duck hunter named "Byron Begnaud" would be transporting a large quantity of illegally taken ducks — as much as a freezer chest full — via one of the landings. In connection with the investigation, it was decided that the agents would check all boats that came into the landings. Agents Breaux and Vaughn were stationed at Stelly's Landing. After checking the first two boats to come in that morning, they saw two youthful hunters, Patrick Damas Moresi and Kern Alleman, approach the landing in a mudboat towing a flatboat. The flatboat contained equipment and supplies. A large number of slain ducks and a large ice chest were fully visible on the bow and deck of the mudboat. After the mudboat landed, one of the agents boarded the vessel and inspected the ducks in sight. Three daily bag limits of the ducks bore tags with the names of "Paul Moresi", "Dr. Howard Alleman" and "John W. Darby" inscribed on them. Two daily bag limits of the ducks were untagged. The agent asked the hunters what was in the ice chest. One of the young hunters replied "Ducks from yesterday." The agent opened the ice chest and found three more daily limits of ducks, two of which were untagged. Agent Breaux summoned two other agents, Jukes and Schreifer, who had been stationed at Little Prairie Landing. When he arrived Agent Jukes asked to see the hunters' life jackets and was told that they were in a locked compartment in the bow. Jukes took the key from the boat's ignition, unlocked the compartment, and inspected the life preservers.
[3] Patrick Moresi and Kern Alleman, then ages 18 and 21, told the agents that they had just left their fathers, Paul Moresi, Jr., a lawyer, and Dr. Howard K. Alleman, a doctor, at their duck camp approximately two miles away in the marsh. Agent Breaux testified that he told the young men that some of the agents would return to the camp with them to complete the investigation. Two of the agents went with the young hunters in their mudboat to the duck camp to verify that the tagged ducks had been taken by the persons named on the tags and to insure that the tags were not being used as a ruse to smuggle out the ducks supposedly stockpiled at a camp in the marsh by Byron Begnaud. After the agents discussed the violations with the fathers of the young hunters and verified the proper tagging of the limits of birds found in the boat, Agent Jukes lifted the lid of an empty ice chest sitting in front of the camp and glanced inside. The entire group returned to Stelly's landing where Patrick Moresi and Kern Alleman were issued citations for violating the federal game law and regulations by their failure to properly tag ducks killed the previous day. The agents released the young hunters but confiscated the ducks in the ice chest. Approximately 45 minutes to one hour elapsed during the detention. After reviewing the charges, the United States Attorney refused to prosecute. *West Page 1084 
[4] Patrick Moresi and Kern Alleman returned to the duck camp on March 25, 1986. On the door they discovered a business card of Scott Guillory, Louisiana Wildlife Enforcement Agent, with a handwritten inscription on its back: "We missed you this time but look out next time!!" [Signed] "Jimmie and Scott".
[5] Paul Moresi, Jr., Howard K. Alleman, Patrick Moresi and Kern Alleman filed a civil damage suit against the State of Louisiana and its game agents under 42 U.S.C. § 1983, Article I, § 5 of the 1974 Louisiana Constitution, and La.Civil Code art. 2315 for deprivation of their rights secured by the Constitutions and laws in connection with the incidents. Kern Alleman died before trial, and his legal successors were substituted for him. After a bench trial, the district court rendered judgment in favor of the plaintiffs against all of the defendants except for one of the game agents, awarding plaintiffs actual damages of $43,000, punitive damages of $4,000, and attorneys' fees of $32,939.10.
[6] In its oral reasons for judgment the trial court made the following findings of fact and conclusions of law: The agents did not have reasonable cause to detain Patrick Moresi and Kern Alleman on January 11, 1986 or to conduct any of the searches or seizures. Moresi and Alleman in fact had not committed any offense. Although the agents honestly believed they were following the law as they understood it, they were in fact ignorant of the correct interpretation of the law. Therefore, they legally were not in good faith. The two agents who left the business card at the duck camp on March 25, 1986 did so by mistake, having confused the Moresi-Alleman camp with that of another. Therefore, these two agents are liable only for their negligence under state law.
[7] The Court of Appeal, a panel of three judges, with one judge dissenting and one judge concurring in the result affirmed the trial court judgment, except for the punitive damage award which was reversed, and the attorneys' fees award which was reduced. Moresi v. Dept. ofWildlife Fisheries, 552 So.2d 1259 (La.App. 3d Cir. 1989). We granted certiorari to review the decisions below for possible errors in the selection and application of legal precepts. 558 So.2d 592 (1990).
[8] Section 1983 and Qualified Immunity
[9] Section 1983 of title 42, United States Code, in pertinent part provides:
[10] Every person who, under color of any statute, ordinance, regulation custom, or usage, of any state or territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.
[11] 42 U.S.C.A. § 1983 (West 1981).
[12] To recover under § 1983, a plaintiff must allege and prove two essential elements. First, a plaintiff must show that conduct occurred under color of state law. Second, a plaintiff must show that this conduct deprived him or her of a right, privilege or immunity secured by the Constitution or a law of the United States. See 2 Rotunda, Nowak 
Young, Treatise on Constitutional Law § 19.6 et seq. (1986); and, S. Nahmod, Civil Rights and Civil Liberties Litigation: The Law of Section 1983, § 2.01 (1986).
[13] Although the statute's language does not expressly incorporate any common law immunities, the United States Supreme Court concluded that Congress intended that common law tort principles of immunity should apply to § 1983 actions. See Nahmod, supra § 8.01. Consequently, when an official performs a function integral to the judicial process or a traditional legislative function, the official is absolutely immune
from § 1983 damage liability for acts performed in those capacities, and, in general a qualified immunity applies to most acts of government officials. See 2 Rotunda, Nowak Young, supra § 19.21; and, 1 Cook Sobieski, Civil Rights Actions § 2.06[B] (1990). The decisions of the Supreme Court and the circuits demonstrate that the qualified immunity test *West Page 1085 
covers all state and local government officers at all levels of responsibility with the exception of those who have absolute immunity. S. Nahmod, Civil Rights Civil Liberties Litigation: A Guide to § 1983, § 8.14 at p. 261 (1979). See, e.g., Scheuer v. Rhodes,416 U.S. 232, 247-48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974), appeal after remand, 570 F.2d 563 (6th Cir. 1977) certiorari denied, 435 U.S. 924,98 S.Ct. 1488, 55 L.Ed.2d 517 (1978) ("[I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent on the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based.")
[14] Until recently, the availability of qualified immunity was determined by a good faith test having two parts; an objective and a subjective component. See 2 Rotunda, supra § 19.29; and, S. Nahmod, Civil Rights and Civil Liberties Litigation: The Law of Section 1983, § 8.02 (1986). An official could not invoke qualified immunity if he"knew or reasonably should have known" that his actions would violate the plaintiff's constitutional rights "or if he took the action with maliciousintention to cause a deprivation of constitutional rights or other injury. . . ." Harlow v. Fitzgerald, 457 U.S. 800, 815, 102 S.Ct. 2727,2737, 73 L.Ed.2d 396, 409 (1982) (Emphasis by Court). See also Wood v.Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).
[15] However, because the subjective element made it difficult for the trial courts to weed out insubstantial claims, the Supreme Court inHarlow v. Fitzgerald, fashioned a new rule, holding "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 817-19,102 S.Ct. at 2738-39, 73 L.Ed.2d at 410-11 (footnotes and internal citations omitted). In elaborating on the new test the Court stated:
[16] Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to `know' that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.
[17] Id.
[18] Harlow, therefore, establishes a new two-part test under which a public official may claim that his conduct is protected by qualified immunity. First, the court must look to currently applicable law and determine whether the law was clearly established at the time the action in question occurred. 2 Rotunda, supra § 19.29 at p. 798; see Statev. McFetridge, 484 F.2d 1169, 1174 (7th Cir. 1973) ("the narrow reading by a public official of a case on constitutional law must be upheld unless patently unreasonable and without arguable support"). The defendant pleading qualified immunity is entitled to dismissal before the beginning of discovery if the plaintiff's allegations do not state a claim of violation of clearly established law. Harlow v. Fitzgerald,457 U.S. at 817-18, 102 S.Ct. at 2738. If the court determines that the law *West Page 1086 
was clearly established at the time the action occurred, the Harlow analysis requires the public official claiming immunity to show that, because of extraordinary circumstances, "he neither knew or should have known of the relevant legal standard." 457 U.S. at 819,102 S.Ct. at 2739; 2 Rotunda supra § 19.29 at p. 800; see, e.g., Barnett v.Housing Authority of Atlanta, 707 F.2d 1571 (11th Cir. 1983).
[19] Qualified or "good faith" immunity is an affirmative defense that must be pleaded by a defendant official. Harlow v. Fitzgerald,457 U.S. at 815, n. 24,102 S.Ct. at 2736, n. 24; Gomez v. Toledo, 446 U.S. 635,100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). But the Supreme Court has not yet decided which party has the burden of proving or disproving entitlement to qualified immunity. See 2 Rotunda, supra § 19.38 at 800; S. Nahmod, Civil Rights and Civil Liberties Litigation: The Law of Section 1983, § 8.16 (1986).
[20] In the present case, it is undisputed that the defendant officers' conduct occurred under the color of state law and within the performance of their discretionary functions. Further, the defendants have clearly carried their burden of pleading qualified immunity. The § 1983 issues remaining for our review concern (1) whether the plaintiffs have shown that the defendants' conduct deprived them of a right, privilege or immunity secured by the Constitution or federal law, and if so, (2) whether qualified immunity is available to shield the defendants from liability for civil damages.
[21] Investigatory Stop
[22] The plaintiffs allege that the game agents first violated theFourth Amendment rights of Patrick Moresi and Kern Alleman by stopping them and detaining them for questioning without having probable cause to believe that they had violated any law. We reject this argument and find that the officers' conduct in stopping the hunters for questioning as they brought their boat into Stelly's Landing did not deprive them of any right, privilege or immunity secured by the U.S. Constitution or federal law. Consequently, with regard to the officers' investigatory stop of the hunters it is unnecessary to consider whether the officers were entitled to qualified immunity.
[23] The Fourth Amendment applies to a seizure of the person, including a brief investigatory stop such as that involved in the stop of a vehicle or a vessel. See United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690,66 L.Ed.2d 621 (1981); Reid v. Georgia, 448 U.S. 438, 100 S.Ct. 2752,65 L.Ed.2d 890 (1980); United States v. Brignoni-Ponce, 422 U.S. 873,95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Davis v. Mississippi, 394 U.S. 721,89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); Terry v. Ohio, 392 U.S. 1,88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Nevertheless, in some circumstances an officer may detain a suspect briefly for questioning although he does not have "probable cause" to believe that the suspect is involved in criminal activity, as is required for a traditional arrest. Brown v. Texas,
supra; United States v. Brignoni-Ponce, 422 U.S. at 880-881,95 S.Ct. at 2579-80; see Terry v. Ohio, 392 U.S. at 25-26, 88 S.Ct. at 1882. An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be engaged in criminal activity, or there must be reasonable grounds to believe that the person is wanted for past criminal conduct. United States v. Cortez, 449 U.S. at 417,101 S.Ct. at 694; Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357
(1979); Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660
(1979); United States v. Brignoni-Ponce, 422 U.S. at 884,95 S.Ct. at 2581; Adams v. Williams,407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612
(1972); Terry v. Ohio, 392 U.S. at 16-19, 88 S.Ct. at 1877-79. Based on the totality of the circumstances — the whole picture — the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. UnitedStates v. Cortez, 449 U.S. at 417, 101 S.Ct. at 694; See, e.g., Brown v.Texas, 443 U.S. at 51, 99 S.Ct. at 2640; United States v.Brignoni-Ponce, 422 U.S. at 884, 95 S.Ct. at 2581.
[24] For purposes of analyzing a situation and determining whether to make an *West Page 1087 
investigatory stop, the totality of circumstances may include the officer's objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operations of certain kinds of lawbreakers. From these data, a trained officer may draw inferences and make deductions — inferences and deductions that might well elude an untrained person. United States v.Cortez, 449 U.S. at 418, 101 S.Ct. at 695.
[25] In the present case the agents had been informed that during the final days of the hunting season a suspected game violator would be exiting the marsh at Stelly's landing or another nearby landing with a large quantity of illicit game. None of the agents knew the suspect by sight or who his hunting companions might be. It was obvious that Patrick Moresi and Kern Alleman were transporting and had the possession or custody of substantially more than their daily bag limits of migratory game birds. Further, it was evident that the two hunters also had a large ice chest, and the officers were aware from their experience and training that game violators frequently used such containers to hide excess game or to obscure the date of its taking. Under the circumstances, the agents had a particularized and objective basis for suspecting that the hunters were engaged or had engaged in game violations. The limited purpose of the stop in this case was to question the occupants of the boat about the ducks in their possession. Accordingly, the officers were justified in detaining Moresi and Alleman briefly for questioning, although they did not at first have probable cause to believe that they were lawbreakers.
[26] Inspection of Ice Chests and Compartments
[27] Whether the officers' actions in searching the ice chests and boat compartment violated any constitutional rights of the plaintiffs is a debatable question. It need not be resolved in this case, however. This is not a criminal prosecution in which the hunters seek to suppress or exclude evidence discovered during that search. In this civil rights action, even if the search of the ice chests and compartment violated the plaintiffs' constitutional rights the officers may upon proper showing invoke qualified good faith immunity as a defense.
[28] Applying the principles of qualified immunity, the relevant question is whether the officers' conduct in inspecting the ice chest or the life preserver compartments violated "clearly established statutory or constitutional rights of which a reasonable person would have known".Harlow v. Fitzgerald, 457 U.S. at 818, 102 S.Ct. at 2738. Stated differently, the question is whether a reasonable officer could have believed these inspections to be lawful, in light of clearly established law and the information the searching officers possessed. See Andersonv. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523,532 (1987).
[29] It was not clear at the time of these searches, and is still not today, whether the constitution or federal law prohibits game agents from making random or checkpoint stops in the marsh for the purpose of ensuring compliance with hunting and fishing laws. In Delaware v.Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Supreme Court held unreasonable under the Fourth Amendment state patrol officers' practice of making random stops to check driver's licenses and vehicle registrations without at least articulable and reasonable suspicion of a violation of law. The court reasoned that the state's interest in discretionary spot checks as a means of insuring the safety of its roadways does not outweigh the resulting invasion of privacy, given the physical and psychological intrusion visited on the occupants of a vehicle by a random stop to check documents. But the majority opinion concluded by stating that "[t]his holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at road-block-type stops is one possible alternative." Delaware v. Prouse, 440 U.S. at 663,99 S.Ct. at 1401. Moreover, Justices Blackmun and Powell, in a concurring opinion, remarked on the scope and effect of *West Page 1088 
the court's opinion, observing, in pertinent part, that
[30] I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the court's balancing process, and the value factors under consideration, would be quite different.
[31] 440 U.S. at 664, 99 S.Ct. at 1401 (Emphasis added).
[32] A number of state courts have relied on Prouse to approve random and checkpoint stops and varying degrees of inspections by game agents. See State v. Halverson, 277 N.W.2d 723 (S.D. 1979) ("Since it is a privilege to hunt wild game, a hunter tacitly consents to the inspection of any game animal in his possession."); State v. Tourtillott, 289 Or. 845,618 P.2d 423 (1980) ("the governmental interest in the . . . preservation of wildlife . . . justif[ies] the minimal intrusion upon theFourth Amendment rights of those stopped for brief questioning and a visual inspection of their activities."); Drane v. State, 493 So.2d 294 (Miss. 1986) ("any vehicle may be searched for illegal game or firearms while within, entering or leaving a management area"); People v. Layton,196 Ill. App.3d 78, 142 Ill. Dec. 539, 546, 552 N.E.2d 1280, 1287 (1990) ("[I]mplied consent . . . to search . . . limited to containers of a size and type as experience dictated might be used for holding separate any illegally taken game. . . .").
[33] Although we do not necessarily agree with these interpretations of Prouse, and they have received cogent criticism, 4 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 10.8(e) (2d ed. 1987);State v. Tourtillott, 618 P.2d at 435 (Linde, J., dissenting), we conclude that on January 11, 1986, the date of the conduct at issue in the present case, a reasonable officer could have believed that either a checkpoint or a random stop and inspection of the mudboat containing Patrick Moresi, Kern Alleman and their game did not violate clearly established statutory or constitutional rights. Furthermore, in light of the information the searching officers possessed, the fact that the two hunters had in their open possession on the bow of the mudboat five limits of ducks, two untagged and three tagged with names of absent persons, the officers had grounds for at least an articulable and reasonable suspicion that Moresi and Alleman were involved in game violations. When the officers were informed that the ice chest contained additional ducks, the particularized and objective basis for suspicion became more firm. Under all of the above circumstances, a reasonable officer could have believed that an inspection of the ice chest and compartments of the boat for illegal game was justified and lawful.
[34] The Supreme Court has said nothing since Prouse to undermine such a reading of the federal constitutional law as of January 11, 1986. Its recent decision in Michigan State Police Department v. Sitz,
___ U.S. ___, 110 S.Ct. 2481,110 L.Ed.2d 412 (1990) approving a surprise sobriety checkpoint program may lend it more support. In that case the court found that there is "virtually no difference" between a routine stop at a permanent, fixed checkpoint and a surprise stop at a sobriety checkpoint and concluded that the law enforcement interest in using sobriety checkpoints outweighs the citizen's interest in freedom from random, unannounced investigatory seizures.
[35] Agent Jukes' slight intrusion of looking into an empty ice chest at the camp occurred after a valid arrest of the young hunters and during the agents' visit to verify the fathers' duck tags and to make sure the Moresi-Alleman group was not part of the illegal duck smuggling operation about which they had received a tip. As we have noted, many courts have allowed game agents to conduct searches of hunters and their gear in the field based simply on the highly regulated nature of hunting, the state's dominant interest in the management and conservation of wildlife, and the view that hunting is not a right but a privilege to which licensing requirements apply. See W. Ringel, *West Page 1089 
Searches Seizures, Arrests and Confessions § 14.3(b)(1) and (2); see also United States v. Raub, 637 F.2d 1205 (9th Cir. 1980), cert. denied 449 U.S. 922, 101 S.Ct. 322, 66 L.Ed.2d 150 (1980) (commercial fishing); Tallman v. Dept. of Natural Resources, 421 Mich. 585,365 N.W.2d 724 (1984) (commercial fishing); Oregon v. Westside Fish Co.,31 Or. App. 299, 570 P.2d 401 (1977) (wholesale fish dealer); and, SouthDakota v. Halverson, 277 N.W.2d 723 (N.D. 1979) (hunting). Although, we do not necessarily agree with these authorities, it cannot be said that their interpretation of the federal constitutional jurisprudence is unreasonable. Accordingly, we cannot say that Agent Jukes' brief look into the ice chest was a violation of a clearly established constitutional right of which a reasonably competent game agent should have been aware.
[36] Probable Cause to Arrest for Violation of Migratory Game Bird Regulations
[37] The court of appeal found that the officers were liable to Patrick Moresi and Kern Alleman under § 1983 for violating their constitutional rights by arresting them without probable cause to believe that they had violated any laws. We do not agree. The facts known to the officers at the time they detained the hunters were sufficient to give a reasonable officer probable cause to believe that Federal game laws and regulations had been violated.
[38] Except as permitted by regulations, it is unlawful at any time to pursue, capture, kill or possess any migratory bird included in the terms of the conventions between the United States and other nations for the conservation of migratory birds and their environments.16 U.S.C. § 703. The regulations adopted in response to that statute provide that migratory game birds may be taken, possessed or transported only in accordance with the restrictions contained in 50 C.F.R. § 20.1
et seq.
[39] The regulations seek to conserve migratory birds by placing limits on the number of birds a hunter may take each day and the number of birds he may possess or transport. 50 C.F.R. § 20.11-20.40. As an integral part of these regulations, § 20.36 imposes a tagging requirement, which provides:
[40] No person shall put or leave any migratory game birds at any place (other than at his personal abode), or in the custody of another person for picking, cleaning, processing, shipping, transportation, or storage (including temporary storage), or for the purpose of having taxidermy services performed, unless such birds have a tag attached, signed by the hunter, stating his address, the total number and species of birds, and the date such birds were killed. Migratory game birds being transported in any vehicle as the personal baggage of the possessor shall not be considered as being in storage or temporary storage.
[41] Evidently, the purpose of the tagging requirement is to facilitate enforcement of the taking and possession limits by obliging a hunter to tag his kill after each day's hunt in order to distinguish it from game taken on another day or game taken by a different hunter.
[42] The tagging regulation, 50 C.F.R. § 20.36, specifically requires a hunter to tag his kill in four situations: when he leaves it (1) at any place other than his home; (2) in the custody of another for picking, cleaning, etc.; (3) for storage; and (4) for the purpose of having taxidermy services performed. The federal courts have interpreted the requirement to mean that a hunter who departs his camp in the area and leaves his untagged birds at the campsite has violated the statute and regulation; and that the regulation clearly prohibits the leaving of a game bird at any place other than the home without affixing the required tag. United States v. Ray, 488 F.2d 15 (10th Cir. 1973); UnitedStates v. Mielke, 367 F. Supp. 518 (W.D.Okla. 1973).
[43] The court of appeal concluded that the officers did not have probable cause to believe any game violation had occurred. Moreover, the appeals court indicated that counsel cannot assert for the state or its agents other grounds for the arrest of which the officers were unaware or unable to articulate. We disagree. The state and *West Page 1090 
the agents are not foreclosed from proving probable cause simply because the officers were mistaken as to the legal principles supporting their action or were unable to precisely articulate them. The probable cause test is an objective, not a subjective, one. LaFave, Search Seizure § 3.2(b) at p. 567. Probable cause may not be established simply by showing that the officer who made the challenged arrest or search subjectively believed that he had grounds for his action. Beck v. Ohio,379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); The facts must be such as would warrant a belief by a "prudent man", "a man of reasonable caution", or "a reasonably discrete prudent man". Beck v. Ohio, supra. In evaluating the reasonableness of a particular search or seizure in light of the particular circumstances "it is imperative that the facts available to the officer at the moment of the seizure or search `warrant a man of reasonable caution in the belief' that the action was appropriate". Terry v. Ohio, 392 U.S. at 21-22, 88 S.Ct. at 1880.
[44] Accordingly, the mere subjective conclusion of an officer as to probable cause is not binding on the court which must independently scrutinize the objective facts to determine the existence of probable cause. Furthermore, since courts do not hesitate to overrule an officer's determination of probable cause when none exists, they may also find probable cause in spite of an officer's judgment that none exists. U.S.v. Pollock, 739 F.2d 187 (5th Cir. 1984); State v. Collins, 378 So.2d 928,930 (La. 1979); State v. Peebles, 376 So.2d 149, 150 (La. 1979); Statev. Davis, 359 So.2d 986, 988, 989, n. 4 (La. 1978); State v. Nelso,433 So.2d 73 (La. 1983) Thus, the fact that an officer did not believe there was probable cause and proceeded on a consensual or Terry-stop rationale would not foreclose the state from justifying the custody by proving probable cause. Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319,75 L.Ed.2d 229 (1983) (plurality); Peters v. New York, 392 U.S. 40,88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).
[45] Consequently, when the officers stopped the hunters for questioning, learned that they had ducks in the ice chest that had been taken the day before, and discovered two limits of untagged ducks in the ice chest, they were aware of facts that would give a reasonable officer probable cause to believe that the hunters had violated50 C.F.R. § 20.36. The regulation has been authoritatively construed to prohibit a hunter from leaving his slain birds at his campsite or anywhere except his home without tags. U.S. v. Ray, supra; U.S. v.Mielke, supra. Since the hunters had untagged ducks they had admittedly killed the previous day there was probable cause to believe they had not tagged their limits from the previous day but had left them untagged at their campsite while they were away hunting. Although § 20.36 provides that migratory birds being transported in any vehicle as personal baggage of the possessor shall not be considered as being in storage or temporary storage, this provision does not relieve a hunter of his obligation to affix the required tag before he leaves a game bird at his camp or any place other than his home. Even though the violations appear to have been relatively innocuous, and the United States Attorney did not accept the charges for prosecution, we cannot say that the agents violated clearly established statutory or constitutional rights, in view of the federal jurisprudence and the trial judge's finding that the agents conscientiously followed the law as they understood it.
[46] Nevertheless, plaintiffs argue that, even if the arrests were valid initially, the agents violated the youths' civil rights by unreasonably detaining them and unlawfully seizing their mudboat. The record developed at trial shows that Patrick Moresi and Kern Alleman were detained for some 45 minutes to one hour while the officers continued their investigation at the hunting camp. The Fourth amendment requires a judicial determination of probable cause as a prerequisite to an extended restraint of liberty following arrest. Gerstien v. Pugh, 420 U.S. 103,95 S.Ct. 854, 43 L.Ed.2d 54 (1975). But the relatively short period of detention here was not such a "significant pretrial restraint of liberty" that a judicial determination of probable cause was *West Page 1091 
required. Gerstien v. Pugh, 420 U.S. at 125, 95 S.Ct. at 868; see, e.g.,Chaffy v. Turoff, 804 F.2d 20 (2d Cir. 1986) (detention of 45 minutes while issuing summonses did not violate the Fourth Amendment); Wilson v.Waldon, 586 F. Supp. 1235 (W.D.Mo. 1984) (2 hour detention after arrest for killing deer out of season did not violate Fourth Amendment). In fact, the jurisprudence indicates that a significantly longer detention is required to violate "clearly established" Fourth Amendment rights.Warren v. City of Lincoln, 864 F.2d 1436 (8th Cir. 1989) (2 hour 20 min. detention after warrantless arrest for attempted burglary "falls well short of the extended restraint of liberty prohibited by Gerstien.") See also McConney v. City of Houston, 863 F.2d 1180 (5th Cir. 1989) (4 or 5 hr. detention after a warrantless arrest for public intoxication would not violate constitution); Brown v. City of Chicago, 713 F. Supp. 250
(N.D.Ill. 1989) (17 hour delay between warrantless felony arrest and probable cause hearing did not violate Constitution.)
[47] Generally, the courts have held that "when a person is arrested away from home, the police may impound the personal effects that are with him at the time to ensure the safety of those effects." Cabbler v.Superintendent, 528 F.2d 1142 (4th Cir. 1975); see LaFave § 7.3(c). Pursuant to this principle, the police routinely are permitted to impound motor vehicles when the owner or operator has been arrested or when the vehicle is abandoned. Cabbler v. Superintendent, supra. See, e.g., UnitedStates v. Balanow, 528 F.2d 923 (7th Cir. 1976) (arrest of defendant driving without license, proper for police "to protect the vehicle by removing it from the roadway"); United States v. Ducker, 491 F.2d 1190
(5th Cir. 1974) (arrest of defendant at shopping center, impoundment of his car parked in center lot proper); Mattson v. State, 328 So.2d 246
(Fla.App. 1976) (defendant arrested for driving while intoxicated, car "parked on the side of the road," proper for police to return and impound it); State v. Wallen, 185 Neb. 44, 173 N.W.2d 372 (1970) (arrest of defendant while standing by car at side of highway, impoundment of car proper); State v. Williams, 97 N.M. 634, 642 P.2d 1093 (1982) (defendant arrested in act of robbery, proper to impound his car parked nearby);King v. State, 562 P.2d 902 (Okla.Crim. 1977) (defendant arrested for speeding, impoundment proper as "van would have otherwise been left unattended on a dark country road"); State v. Patterson, 8 Wn. App. 177,504 P.2d 1197 (1973) (defendant driving his car when stopped and arrested, impoundment of car proper). Therefore, we see no reason that the same rule should not apply here to permit the agents to impound the mudboat which would have otherwise been left unattended. Moreover, since the fathers of the two arrested hunters were at their campsite only a short distance away, and one of the fathers, Dr. Alleman, was the owner of the boat, the quickest and most practicable way to protect the boat was to take it to him at the camp. Viewing these circumstances objectively, we conclude that no clearly established constitutional or statutory rights were violated in the handling of the mudboat.
[48] State Constitutional Claims
[49] Plaintiffs seek, alternatively, to recover damages for violations of their rights under the state constitution to be secure in their persons and property from unreasonable searches, seizures and invasions of privacy. Accordingly, we are called upon to decide whether, in appropriate circumstances, an individual whose constitutional right has been violated may recover damages directly under the right to privacy guaranty, and, if so, whether such circumstances are present in this case.
[50] Article I, § 5 of the 1974 Louisiana Constitution provides:
[51] Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the person or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted *West Page 1092 
in violation of this Section shall have standing to raise its illegality in the appropriate court.
[52] By its clear terms the constitution explicitly protects every individual's "person [and] property" from unreasonable searches, seizures, and "invasions of privacy", thereby affirmatively establishing a right to privacy beyond the domain of criminal procedure. Hargrave, Declaration of Rights, 35 La.L.Rev. 1, 20 (1974). The section establishes an affirmative right of privacy impacting on non-criminal areas of the law. Id.; Hondroulis v. Schumacher, 546 So.2d 466, 473 (La. 1989); Roshtov. Hebert, 439 So.2d 428 (La. 1983); Jaubert v. Crowley Post-Signal,Inc., 375 So.2d 1386, 1387-88 n. 2 (La. 1979); Easter Seal Society v.Playboy Enterprises, 530 So.2d 643, 646-47 (La.App. 4th Cir. 1988). This affirmative aspect is indicated by the placement of the article deliberately apart from the other criminal procedure guarantees in Sections 13-21. Hargrave, supra. Moreover, the expression "no law shall" was not used, indicating that the protection goes beyond limiting state action. Furthermore, to the language of the previous constitution ("secure in their persons, houses, papers and effects against unreasonable searches and seizures. . . .") was added protection ofproperty and communications against unreasonable invasions of privacy. The ancestry of the latter phrase can be traced to the establishment inGriswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510
(1965) of a right to privacy and to fear of unreasonable gathering and dissemination of information on individuals through use of computer data banks. Hargrave, supra at 21, citing State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts, September 5, 1973 at 51.
[53] Under the common law of England, where individual rights, such as those protected by Article 1, § 5 of the 1974 Louisiana Constitution, were preserved by a fundamental document (e.g., the Magna Carta), a violation of those rights generally could be remedied by a tradional [traditional] action for damages. The violation of the constitutional right was viewed as a trespass, giving rise to a trespass action. Widgeon v. Eastern Shore Hospital Center, 300 Md. 520, 479 A.2d 921
(1984), citing and discussing Wilkes' v. Wood, Lofft's 1, 98 Eng.Rep. 489 (1763); Huckle v. Money, 2 Wils. 205, 95 Eng.Rep. 768 (1763); Entick v.Carrington, 19 How.St.Tr. 1029 (1765). See also Halperin v. Kissinger,606 F.2d 1192 (D.C. Cir. 1979) aff'd, 452 U.S. 713, 101 S.Ct. 3132,69 L.Ed.2d 367 (1981).
[54] The United States Supreme Court has held that the Fourth Amendment guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority, and that individuals whose constitutional rights have been so violated may recover damages directly under the constitution as a result of federal agents' violation of that amendment. Bivens v. Six UnknownNamed Agents of Fed. Bur. of Narc., 403 U.S. 388, 91 S.Ct. 1999,29 L.Ed.2d 619 (1971). Subsequently, the high court held that violations of the Fifth and Eighth Amendments also give rise to an individual damage action directly under the constitution. Davis v. Passman, 442 U.S. 228,99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); Carlson v. Green, 446 U.S. 14,100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).
[55] Several state courts have recognized that an individual may seek damages for violation of his rights guaranteed by the state constitution. Widgeon v. Eastern Shore Hosp. Center, 300 Md. 520,479 A.2d 921 (1984); Gay Law Students Association v. Pacific Tel. Tel. Co., 24 Cal.3d 458, 156 Cal.Rptr. 14, 595 P.2d 592 (1979); Walinskiv. Morrison Morrison, 60 Ill. App.3d 616, 18 Ill. Dec. 89,377 N.E.2d 242 (1978); Newell v. Elgin, 34 Ill. App.3d 719, 340 N.E.2d 344
(1976); Mayes v. Till, 266 So.2d 578 (Miss. 1972); Lloyd v. StoneHarbor, 179 N.J. Super. 496, 432 A.2d 572 (1981); Terranova v. State,111 Misc.2d 1089, 445 N.Y.S.2d 965 (Ct. of Claims 1982).
[56] Considering the expression of the framers in the textual formula of Article I, § 5, the history of the provision as recorded in the convention proceedings, and the strong resemblance between our state guaranty and that of the *West Page 1093 Fourth Amendment and its English constitutional law antecedents, we conclude that damages may be obtained by an individual for injuries or loss caused by a violation of Article I, § 5 of the 1974 Louisiana Constitution. Historically, damages have been regarded as the appropriate remedy for an invasion of a person's interest in liberty or property. La.C.C. art. 2315
(1870); Sweeten v. Friedman, 9 La. App. 44, 118 So. 787 (1928) (false imprisonment); Cormier v. Blake, 198 So.2d 139 (La.App. 3d Cir. 1967) (malicious prosecution); Dauphine v. Hebert, 37 So.2d 829 (La.App.Orl. 1948) (malicious prosecution); see F. Stone, Tort Doctrine § 200 et seq., in 12 La.Civil Law Treatise (1977); Hayes v. Dompe, 331 So.2d 874
(La.App. 2d Cir. 1976) (trespass and invasion of privacy); Layne La. Co.v. Superior Oil Co., 209 La. 1014, 26 So.2d 20 (1946) (trespass); Stone, supra at § 212 et seq. Moreover, the underlying policy considerations for such an action directly under the state constitution are similar to those supporting the implication of a right of action by theFourth Amendment. An agent acting — albeit unconstitutionally — in the name of the state possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own. We may bar the door against an unwelcome private intruder, or call the police if he insists in seeking entrance. But one who demands admission under a claim of state authority stands in a far different position. See Bivensv. Six Unknown Agents, 403 U.S. at 394, 91 S.Ct. at 2003. Indeed, the limitations on remedies under ordinary state law for violations of rights by other private citizens argue in favor of a state constitutional remedy. The injuries inflicted by officials acting under color of law are substantially different in kind than those inflicted by private parties. Recovery of damages is the only realistic remedy for a person deprived of his right to be free from unreasonable searches or seizures. Rarely will he be able to obviate the harm by securing injunctive relief from any court. Assuming his innocence of the crime charged, the exclusionary rule is simply irrelevant. Bivens v. Six Unknown Agents, 403 U.S. at 407-410,91 S.Ct. at 2010-12. (Harlan, J. concurring.)
[57] Having concluded that an individual is entitled to recover money damages for any injury he has suffered as a result of a state agent's violation of Article I, § 5 of the 1974 Louisiana Constitution, it does not follow that the plaintiffs in the present case are entitled to recover under the circumstances herein. The same factors that compelled the United States Supreme Court to recognize a qualified good faith immunity for state officers under § 1983 require us to recognize a similar immunity for them under any action arising from the state constitution.
[58] In Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288
(1967), the Supreme Court held that police officers sued under § 1983 were entitled to a defense of good faith. The Court stated, "A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." 386 U.S. at 555,87 S.Ct. at 1218. The justification for this limited official immunity was succinctly stated by Chief Justice Burger:
[59] [O]ne policy consideration seems to pervade the analysis: the public interest requires decisions and action to enforce laws for the protection of the public. . . . Public officials, whether governors, mayors or police, legislators or judges, who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices. Implicit in the idea that officials have some immunity — absolute or qualified — for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all.
[60] Scheuer v. Rhodes, 416 U.S. 232, 241-42, 94 S.Ct. 1683, 1689,40 L.Ed.2d 90, 99-100 (1974).
[61] The Court in Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894,57 L.Ed.2d 895 (1978), *West Page 1094 
held that the same type of qualified good faith immunity available to state officers in § 1983 actions was also available to federal officers made defendants in Bivens-type actions for violations of federal constitutional rights. Finding no appreciable difference between state officers subject to § 1983 and federal officers subject to Bivens
actions, the Court stated:
[62] We consider here, as we did in Scheuer the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority. Yet Scheuer and other cases have recognized that it is not unfair to hold liable the official who knows or should know he is acting outside the law, and that insisting on an awareness of clearly established limits will not unduly interfere with the exercise of official judgment.
[63] Butz v. Economou, 438 U.S. at 506-07, 98 S.Ct. at 2911,57 L.Ed.2d at 916.
[64] Accordingly, we believe that a qualified immunity is justified in an action against state officers or persons acting under color of state law for damages caused by a violation of Article I, § 5 of the Louisiana Constitution. Consequently, a plaintiff's allegation and proof of conduct under color of state law that deprived him or her of a right secured by Article I, § 5 may not always assure the plaintiff of recovery. If the defendant shows that the state constitutional right alleged to have been violated was not clearly established, the defendant is entitled to qualified immunity.
[65] Applying the foregoing precepts, we conclude that the game agents' conduct on January 11, 1986 did not violate any clearly established state constitutional rights of the plaintiffs of which a reasonably competent public official should have known. In some respects our state constitution's declaration of rights establishes higher standards of individual liberty than those afforded by the jurisprudence interpreting the federal constitution. State v. Church, 538 So.2d 993 (1989); Statev. Hernandez, 410 So.2d 1381 (La. 1982) But insofar as we can determine the game agents' conduct did not infringe on any such higher standard that had been clearly recognized as of January 11, 1986.
[66] Plaintiffs seek to show that this case is somehow controlled or should be influenced by Louisiana's higher standard of protection of motorists from unreasonable invasions of privacy. Plaintiffs concede that the activities of the game agents on January 11, 1986 at Stelly's Landing did not constitute a roadblock or a checkpoint. Nevertheless, they apparently contend that the agents violated principles of state constitutional law clearly established by this court's decision in Statev. Parms, 523 So.2d 1293 (La. 1988). This argument is not persuasive for several reasons. First, Parms did not clearly establish the principle that motor vehicle sobriety checkpoint stops without reasonable suspicion or probable cause are unconstitutional under Article I, § 5 of the Louisiana Constitution. This principle was not clearly established until our holding to this effect in State v. Church, supra. In Church this court specifically noted that the question of whether DWI roadblocks might be permissible under the Louisiana constitution had been left open in Parms. Id. at 996-997. Second, in any event, both Parms and Church
were decided years after the agents' actions on January 11, 1986 that plaintiffs contend were in violation of their state civil rights. Thus, for this reason alone, plaintiffs cannot rely on Parms as clearly establishing a state constitutional right that was violated by the game agents. Furthermore, reasonable jurists may disagree as to whether theChurch-Parms holding involving motor vehicle sobriety checkpoints is directly and fully controlling with respect to game agents' stops of sportsmen in the marsh for questioning with respect to possible game or boating violations. Finally, as the plaintiffs concede in the beginning, the stop in this case was not made pursuant to a checkpoint but was a Terry-type investigatory stop for questioning based on reasonable suspicion. It is well settled that such investigatory stops based on reasonable, articulable suspicion do not violate state constitutional law principles. State v. Andrishok, 434 So.2d 389 (La. 1983); State v. *West Page 1095 Chopin, 372 So.2d 1222 (La. 1979); State v. Bethley, 452 So.2d 367
(La.App. 1st Cir. 1984).
[67] Infliction of Mental Distress
[68] We are called upon to decide whether the trial court properly awarded the plaintiffs' damages for negligently inflicted mental distress based on state law. On March 25, 1986, over two months after the searches, seizures and arrests that had occurred on January 11, 1986, the plaintiffs discovered that state game agents had left a message on their camphouse door. The message, hand written on the the reverse side of Agent Scott Guillory's business card, read: "We missed you this time but look out next time" [signed] "Jimmie and Scott." Neither Guillory nor the other signatory agent, Jimmie Meaux, were involved in the arrests or other events involving the Moresis and Allemans on January 11th. Furthermore, the trial judge's uncontested factual finding was that Guillory and Meaux had left the message at the Moresi-Alleman camp by mistake. Originally, the agents intended to leave the message at the nearby camp of their friend, Dr. Clyde Prejean, but misinterpreted his directions to the camp. Neither agent had ever been to Dr. Prejean's camp, and at the time of the occurrence both thought that they had left the card on his door. Upon learning of the message found at his camp, Mr. Moresi immediately contacted Dr. Jack C. Cappel, a member of the State Wildlife and Fisheries Commission, and voiced a complaint. Later, he sent Dr. Cappel a letter containing a copy of the note left at the camp. Two days later Guillory called upon Mr. Moresi at his office to explain the mistake and to apologize. Two weeks later the Secretary of the Department of Wildlife and Fisheries had hand-delivered to Moresi a letter containing statements from the agents explaining the mix-up. Several days later Dr. Prejean called Mr. Moresi, confirming that Guillory and Meaux were personal friends and that the note was intended for him. The plaintiffs testified that following these events their enjoyment of the camp was diminished because of their fear of further harassment. However, despite their contention plaintiffs continued to use their camp and improved it by adding air conditioning. The trial court awarded each plaintiff $1,000.00 for his mental distress resulting from the errant message.
[69] This case does not present a situation in which recovery for mental distress may be based upon a breach of contract or a separate tort such as assault, battery, false imprisonment, trespass to land, nuisance, or invasion of the right to privacy. See Prosser Keeton § 12 at p. 60. Nor do the facts of the present case come within the general rule of recovery for the independent tort of intentional infliction of mental distress, the elements of which, according to the Restatement 2d, are: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other result from it, for such bodily harm." Restatement of Torts 2d § 46(1); See Nickerson v. Hodges, 146 La. 735, 84 So. 37 (1920);Steadman v. So. Cent. Bell Tel. Co., 362 So.2d 1144 (La.App. 2d Cir. 1978); Todd v. Aetna Casualty Surety Co., 219 So.2d 538 (La.App. 3d Cir. 1969); Boudoin v. Bradley, 549 So.2d 1265 (La.App. 3d Cir. 1989); Prosser Keeton, § 12 at p. 60; F. Stone, Tort Doctrine § 168, in 12 La.Civil Law Treatise (1977); D. Robertson, Intervening Negligence — Proximate Cause, 23 La.L.Rev. 281 (1963); Note, Damages For Emotional Distress Caused by Intentional Injury to Chattels, 23 La.L.Rev. 805 (1963).
[70] Furthermore, the plaintiffs have not alleged or proved that they suffered any bodily harm or property damage as the result of the agents' negligence in missending the message. Consequently, they are seeking to recover on the basis that defendants' ordinary negligence caused them only mental disturbance. Under the general rule followed by the great majority of jurisdictions, if the defendant's conduct is merely negligent and causes only mental disturbance, without accompanying physical injury, illness or other physical consequences, the defendant is not liable for such emotional disturbance. Prosser Keeton § 54 at p. 361; Restatement of *West Page 1096 
Torts 2d § 436A; Eastern Airlines, Inc. v. King, 557 So.2d 574 (Fla. 1990); Czaplicki v. Gooding Joint School Dist., 116 Idaho 326, 775 P.2d 640
(1989); Niblo v. Parr Mfg., Inc., 445 N.W.2d 351, 354 (Iowa 1989), citingWambsgans v. Price, 274 N.W.2d 362, 365 (Iowa 1979); Decker v. PrincetonPacket, Inc., 116 N.J. 418, 561 A.2d 1122 (1989).
[71] In our jurisprudence, there have been deviations from the general rule. A number of courts have allowed recovery against a telegraph company for the negligent transmission of a message, especially one announcing death, indicating on its face a potential for mental distress. E.g., Graham v. Western Union, 109 La. 1069, 34 So. 91 (1903). Some others have allowed similar recovery for the mishandling of corpses, See French v. Ochsner Clinic, 200 So.2d 371 (La.App. 4th Cir. 1967); Blanchard v. Brawley, 75 So.2d 891 (La.App. 1st Cir. 1954); Morganv. Richmond, 336 So.2d 342 (La.App. 1st Cir. 1976); Shelmire v. Linton,343 So.2d 301 (La.App. 1st Cir. 1977); failure to install, maintain or repair consumer products, Pike v. Stephens Imports, Inc., 448 So.2d 738
(La.App. 4th Cir. 1984); failure to take photographs or develop film,Grather v. Tipery Studios, Inc., 334 So.2d 758 (La.App. 4th Cir. 1976); negligent damage to one's property while the plaintiffs were present and saw their property damaged, Holmes v. Le Cour Corp., 99 So.2d 467
(Orl.La.App. 1958); Lambert v. Allstate Insurance Co., 195 So.2d 698
(La.App. 1st Cir. 1967); and in cases allowing damages for fright or nervous shock, where the plaintiff was actually in great fear for his personal safety. Pecoraro v. Kopanica, 173 So. 203 (Orl.La.App. 1937);Klein v. Medical Building Realty Co., Inc., 147 So. 122 (Orl.La.App. 1933); Laird v. Natchitoches Oil Mill, Inc., 10 La. App. 191, 120 So. 692
(2d Cir. 1929); Cooper v. Christensen, 212 So.2d 154 (La.App. 4th Cir. 1968). There may be other cases, but all of these categories have in common the especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious. Prosser Keeton § 54 at p. 362; W. Malone L. Guerry, Studies in Louisiana Tort Law, 45 (1970);Robertson, supra at 292.
[72] Applying these precepts to the present case, we conclude that Agents Guillory and Meaux should not be held liable for the plaintiffs' mental disturbance caused by the agents' negligence. The agents' acts were not intentional, outrageous or related to another tort. In addition, the plaintiffs' mental disturbance was not severe, or related to personal injury or property damage, and the plaintiffs were not in great fear for their personal safety. Therefore, this case does not fall within any category having an especial likelihood of genuine and serious mental distress, and thus lacks any recognized elements guaranteeing the genuineness of the injury claimed. Id.
[73] Conclusion
[74] For the reasons assigned, the judgments of the court of appeal and the trial court are reversed and plaintiffs' suit is dismissed.
[75] REVERSED.
[76] LEMMON and SHORTESS, JJ., concur.
[77] MARCUS, J., concurs and assigns reasons.
[78] WATSON, J., dissents and would grant a rehearing.
[79] MARCUS, Justice (concurring).
[80] I concur in the result. However, I agree with the state courts which have relied on Delaware v. Prouse to approve random and checkpoint stops and varying degrees of inspections by game agents. Searches of hunters and their gear in the field should be allowed based simply on the highly regulated nature of hunting, the state's dominant interest in the management and conversation of wildlife, and the view that hunting is a privilege which allows the state to inspect any game animal in the hunter's possession.
9:2798.1. Policymaking or discretionary acts or omissions of publicentities or their officers or employees
A. As used in this Section, "public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
D. The legislature finds and states that the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the Constitution of Louisiana.
42:1441.2. Nonimposition of master-servant liability on state by CivilCode Article 2320 and other laws for torts of parish officials; insurancecoverage; interlocal risk management programs
A. Civil Code Article 2320 and other laws imposing liability on a master for the offenses and quasi offenses of his servant shall not extend or apply to and shall not impose liability upon the state for the offenses and quasi offenses of any of those public officers named in Article V, Sections 26, 27, 28, and 29, and Article VII, Section 24, of the Constitution of Louisiana or any of their officers, deputies, assistants, employees, appointees, designees, or representatives.
B. Such public officers shall, by commercial insurance carriers, by self-insurance funds, by joining an interlocal risk management program, or by a combination of any two or more of them, secure general liability insurance coverage on themselves and on their officers, deputies, assistants, employees, appointees, designees, and representatives in amounts of not less than twenty thousand dollars per injured person. Such public officers may secure this insurance coverage themselves or through their respective associations. For purposes of being able to form new interlocal risk management programs or to join existing ones, the office of each such public officer in each parish of the state shall be deemed to be a separate "local governmental subdivision", and each association of such public officers and each combination of such associations shall be deemed to qualify as an "interlocal risk management agency", all within the meanings set forth in R.S. 33:1342.
42:1442. Law enforcement officers accused of crimes committed whileacting within or in furtherance of their scope and course of employment
A. When (1) a law enforcement officer, employed by the state or an agency thereof or by a political subdivision, as that term is defined in Article VI, Section 44 of the Constitution of Louisiana, has been subjected to an institution of prosecution for an alleged criminal act committed when the law enforcement officer is acting in good faith in the performance or in furtherance of the course and scope of his employment as defined by law and the policies and procedures of the law enforcement agency employing him, and (2) he is acquitted of the charge, the prosecution has been dismissed by the district attorney, or the periods of time have expired in which he could be brought to trial and convicted, the officer shall be reimbursed for reasonable attorney's fees incurred by him on account of the institution of prosecution. No reimbursement shall take place under the provisions of this Section until the suit is dismissed or finally adjudicated by a court of competent jurisdiction and the period for taking an appeal has expired. Reimbursement shall be from the governing authority by whom the officer was employed at the time of the alleged crime.
B. In a case of dismissal of prosecution, the officer may agree with the employer prior to the dismissal to waive any or all of his rights under this Section if the prosecution is dismissed. If an officer enters into a waiver agreement, it shall not be used as evidence of anything except as evidence of itself in a proceeding by the officer against his employer on matters affected by the waiver.
C. No law enforcement officer, unclassified or otherwise, shall lose any seniority, back pay, or other benefits within the authority of his employer to grant or withhold on account of institution of prosecution for a crime allegedly committed within the performance or in furtherance of the course and scope of his employment without an independent hearing or other established procedural step by the employer to meet fair due process standards.
D. Nothing herein shall prohibit an employer from suspending an employee pending a final resolution of an instituted prosecution.
E. Notwithstanding any other provision herein, the payments authorized by this Section shall be made only if the law enforcement officer has not violated any other rights or privileges secured by the state or federal constitution. The rights of such law enforcement officer shall not be construed as greater than those of an ordinary citizen.
13:2593. Legal representation by the attorney general
A. It is hereby declared to be the public policy of this state that the state, through the attorney general, shall provide legal representation to a justice of the peace or a constable of this state in all claims, demands, or suits, if such a claim, demand, or suit arises out of the discharge of his duties and within the scope of his office and the claim, demand, or suit did not result from his intentional wrongful act or gross negligence.
B. Within five days after a justice of the peace or constable is served with any summons, complaint, process, notice, demand, or pleading, he shall deliver the original or a copy thereof to the attorney general. If, after thorough investigation by the attorney general, it appears that the defendant was not acting in the discharge of his duties and within the scope of his office at the time of the alleged act or omission, or that he was acting in an intentionally wrongful manner or was grossly negligent, the attorney general's office shall decline representation and the state shall not be responsible for providing any representation to him.
C. The decision of the attorney general not to defend a justice of the peace or constable and any and all information obtained by him as a result of the investigations conducted pursuant to Subsection B shall be considered confidential and shall not be admissible as evidence in any legal proceeding and no reference thereto shall be made in any trial or hearing.
D. Nothing in this Section shall in any way impair, limit, or modify the rights and obligations of any insurer under any policy of insurance or impair the right of the individual to obtain private counsel in his own behalf.
E. This Section shall not be construed as creating a right of indemnification by a justice of the peace or constable against the state for any claim, demand, suit, or judgment whatsoever.